Argued November 27, 1928, affirmed February 26, 1929.

S. A. LYTLE ET AL. *v.* SARAH L. HULEN ET AL.

(275 Pac. 45.)

For appellants there was a brief and oral arguments by *Mr. Walter C. Winslow* and *Mr. S. M. Endicott.*

For respondents there was a brief over the name of *Messrs. Cake & Cake* with oral arguments by *Mr. L. A. Liljeqvist* and *Mr. B. W. Macy.*

BEAN, J.—The first question to determine pertains to the reformation of the deeds. It is disclosed by the record that Mary A. Ramp, the mother of defendant, Sarah L. Hulen, out of love and affection for her daughter, made, executed and delivered to the daughter Sarah L. Hulen, two deeds of gift of two farms, one known as the "McKinney Farm" and the other the "Schmitke Farm." Mrs. Hulen did not pay her mother a dollar for said deeds. Mrs. Hulen described the delivery of the deed of the McKinney Farm dated October 14, 1903, as follows: When she and her husband were living on a farm in Polk County, her mother Mrs. Ramp wanted her to go on to the McKinney Farm, Mrs. Hulen was fearful that it would cause hard feelings on the part of her sister. Mrs. Ramp said, "It is mine and I am going to give it as I please." When she had finished her meal, she said to Mr. Hulen, "Hand me my satchel." Mrs. Ramp handed the deed to Mrs. Hulen and said: "Here is your farm." Mrs. Hulen said, "I was not expecting it." Mrs. Hulen had the deed recorded, paid the recording fees, and had it returned to her and she put the deed away. Mrs. Hulen had no agreement with her mother, or anyone, with reference to the kind of language that should be inserted in the deed. She has been in possession of the land ever since, claiming it as her own.

Mr. Hulen testified, to the effect, that when Mrs. Ramp made them a visit she took the deed from her grip sack and said to my wife, "Here, Deemie, is your farm," and gave her this deed, and all the old deeds from the government; "we have all the old deeds from one party to another clear on up"; that Mrs.

Ramp stated she gave it to her daughter "as her own."

Mr. Carey F. Martin, an attorney of Salem, testified as a witness for plaintiff that all of the deeds were executed before him. With reference to the execution of the deed of the McKinney farm, Mr. Martin states as follows:

"It was her idea to convey a farm; as I remember it they called the McKinney place; I do not remember the number of acres, something like three hundred, it was quite a large farm somewhere up above Turner, to her daughter, and it was her desire to fix up the title so that the daughter would have the use of it, and be unable to sell it or encumber it, and that matter was talked over there in the office, and I think Judge BONHAM dictated the wording in the deed to carry out that, and I think I wrote it out either in long hand or typewriting. (Witness looks at document.)"

That Mrs. Ramp had several deeds made in March, 1904, at the same time this correction deed was made, and "I remember her talking it over that she wanted her deeds made to the parties and 'to the heirs of her body only,' that is to their children. She wanted to tie her property up so they would not run through with it; that is what she stated many times."

In regard to the deed of the Schmitke farm (Plaintiffs' Exhibit 3) Mr. Martin testified in part as follows:

"Q. Did you have any conversation with her with reference to what estate she wanted to give her daughter, Mrs. Hulen, in the Schmitke farm? A. That matter was talked over several times in the office, I think.
"Q. Judge BONHAM was still alive at that time? A. I am not sure about that whether he was still alive or not, but it was her expressed wishes that the

deeds to her daughter Deemie, as she called her, should be made so that Deemie should have a life estate in the property and be unable to sell or convey the property; she told me that a great many times in her talks.

"Q. Was that the intention you attempted to carry out in drafting this deed to the Schmitke place? A. That is my recollection of it now."

That Mrs. Ramp was a woman of wonderful ability and mind of her own, and was boss, not only of her household, but of her attorneys; she wanted the deeds fixed a certain way. He stated that he talked with Mrs. Ramp many times since the death of Judge BONHAM.

"Q. What was it she inferred with reference to the kind of title she conveyed to Mrs. Hulen? A. Some time after the death of Judge BONHAM in checking up some of her properties and deeds; we talked this matter over, and I told grandma that the courts were holding that deeds drawn to the heirs of the grantor's body were held to be fee simple deeds in some instances, and these deeds she had made to Deemie, as she called her, might be constructed to be ordinary fee simple deeds in place of being deeds tied up during her life and to her heirs like grandma wanted it; and, grandma said that was all right that as long as Deemie did not know about it Deemie would not sell the land or mortgage it, and as long as Deemie thought they were tied up, it was just as good as if it was really tied up, and she cautioned me not to tell Deemie about it, and I did not tell Deemie because Deemie did not come to our office for a long while after."

1. It is in evidence that Mrs. Hulen, in passing by the Schmitke farm with her mother, remarked what a beautiful home that would be. Mrs. Ramp inquired: "Do you like that place better than where you are

living,'' and Mrs. Hulen replied, ''Yes, it is a little higher.'' Then Mrs. Ramp said, ''Look it over and if you like it buy it.''

They purchased the Schmitke farm. It was conveyed to Mrs. Ramp and Mrs. Ramp executed the deed to Sarah L. Hulen. At the same time Sarah L. Hulen and her husband executed a mortgage on the farm to Schmitke in the sum of $5,000, as a part of the consideration for the farm; that at that time, or soon after, Mrs. Ramp paid this mortgage as she did not like to pay interest; that Mrs. Ramp paid all the money to Schmitke.

The Hulens have been occupying these farms and working them for twenty-two years. Mrs. Hulen claimed to own them. It would seem that Mrs. Ramp well understood that she had conveyed a good title to the Schmitke farm to Mrs. Hulen, if Mrs. Hulen and her husband could execute a mortgage thereon in favor of Schmitke. It also appears that Mrs. Hulen and her husband executed a mortgage upon the premises to Mrs. Ramp for $2,900.

When Mrs. Ramp was informed by her attorney that her deed to her daughter probably conveyed a fee-simple title to the real estate, she appeared to have been satisfied to let it remain so, if her daughter did not know it, or mortgage or sell the land, and Mrs. Ramp was willing to let the title to the land remain that way, and take a chance on her daughter not encumbering it.

Mrs. Ramp lived until 1916 and made no attempt to reform the deeds. Plaintiffs, after more than twenty years since the recording of these instruments, are in no position to reform them upon the ground that they do not conform to the mutual intention of Mrs. Ramp, her daughter and plaintiffs.

They seek to add to the instruments certain language now suggested which was not mentioned by either the grantor or grantee at the time of their execution. They also seek, after that long lapse of time after its recording, to correct a purported corrective deed upon the ground that even the corrective deed does not truly indicate what was in the mind of Mary A. Ramp at the time it was filed.

There was no agreement between Mary A. Ramp and the grantee or the plaintiffs, as to the language to be used in the deeds, or the kind of estate intended to be conveyed thereby. The language of the deeds was in conformity with the directions of Mary A. Ramp. There is no evidence of a mutual mistake. No fraud in the matter is suggested: *Evarts* v. *Steger,* 5 Or. 147; *Mitchell* v. *Holman,* 30 Or. 280 (47 Pac. 616); *Rosenberg* v. *General Accident F. & L. Assur. Corp.,* 98 Or. 118 (193 Pac. 441).

2, 3. The instruments were drafted by Mary A. Ramp through her attorneys and it is not shown that they were not exactly as she intended them to be. If the deeds were as she intended they should be and, she was simply mistaken as to their legal effect, it is a mistake of law, which should not be reformed after the title has stood for more than twenty years, under the circumstances of this case. But where the instruments do not express the agreement of the parties, if there be one, it is immaterial whether the mistake be one of fact or law: *Smith* v. *Cram,* 113 Or. 313, 323 (230 Pac. 812); *Richmond* v. *Ogden S. R. Co.,* 44 Or. 48, 55 (74 Pac. 333); *Kraemer* v. *Alvord,* 97 Or. 227, 231 (189 Pac. 990).

4. This suit for reformation is an appeal to an extraordinary power of a court of equity. We must

scrutinize the clause sought to be inserted in the instruments, and consider its equitable or inequitable features: *Dolph* v. *Lennon,* 109 Or. 336, 355 (220 Pac. 161).

Whatever Mrs. Ramp's intentions were when she executed the deeds, her statements when she was informed of their legal import, to the effect, that they were all right, and allowing them to remain of record for so long a time without seeking the aid of a court of equity to reform them, and the fact that she executed her will in 1915 with the clause above quoted, without suggesting that she had conveyed to her daughter only a life estate in the lands, indicates that she was satisfied with the deeds as they were and that she ratified and confirmed the conveyance.

5. This suit was commenced November 18, 1926, more than twenty years after the execution and recording of the instruments, in excess of the period provided for the recovery of real property, and more than ten years after the death of Mary A. Ramp, the grantor. The plaintiffs do not show sufficient facts excusing laches. The plaintiffs had constructive notice of the contents of the deeds when the instruments were recorded. A duly recorded deed conclusively gives notice of its contents and legal effect: 2 Devlin on Deeds, p. 1305, § 710; *Tualatin Academy* v. *Keene,* 59 Or. 496, 519 (117 Pac. 424); *Baillie* v. *Columbia Gold Mining Co.,* 86 Or. 1 (166 Pac. 965, 167 Pac. 1167); *Crowe* v. *Crowe,* 70 Or. 534, 555 (139 Pac. 854).

6. There is considerable testimony in the record tending to show the declarations and statements of Mary A. Ramp, made after she executed the deeds and not in the presence of Mrs. Hulen the grantee, plaintiffs claiming that such statements indicated

what her intentions were when she executed the conveyances. In regard to this testimony we quote the syllabus to the case of *Adair* v. *Adair*, 38 Ga. 46, which reads thus:

"In a proceeding to reform a deed, on the grounds of fraud and mistake, the declarations of the grantor, made subsequent to the execution of the deed, and in the absence of the grantee, are not admissible to prove a mistake in the deed, which may be corrected in Equity."

This is undoubtedly the rule. Therefore such evidence need not be considered. Plaintiffs cite *Adair* v. *McDonald*, 42 Ga. 506, upon the question of the reformation of a voluntary defective conveyance. The latter case is cited and quoted from in the opinion in *Clark* v. *Hindman*, 46 Or. 67, 69 (79 Pac. 56, 57). We find there the following language:

"A court of equity will not interfere against a grantor, in favor of a volunteer, to correct a mistake or to reform a defective conveyance. The reason for this rule is stated by the court in *Adair* v. *McDonald*, 42 Ga. 506, as follows: 'If there is a mistake or a defect, it is a mere failure in a bounty, which, as the grantor was not bound to perfect.'" *Adkinson* v. *Blomquist, ante,* p. 211 (274 Pac. 312).

7. We have considered the question in the present case as though a voluntary conveyance might be reformed, in a proper case, as between those claiming under the same deed when the grantor has no interest in the controversy: 34 Cyc. 929. The rule is stated in 2 Story's Equity Jurisprudence (14 ed.), Section 982, thus:

"The right to correct and reform a written instrument executed by mistake, or fraud, is one that at-

taches primarily to conveyances to which the injured party stands as a *bona fide* purchaser for value, and does not apply, as a general rule, where the conveyance is the evidence of the bounty of the grantor and a mere gratuity as to the grantee. * * The grantor, if living, could not be compelled to correct the deed; and in the absence of consent of all of the parties, equity will not grant the relief.''

See, also, 5 Pomeroy's Equity Juris. (2 ed.), § 2100; *Langley* v. *Kesler,* 57 Or. 281, 285 (110 Pac. 401, 111 Pac. 246).

8. It is the general prevailing rule that the doctrine of reformation will not be enforced, where to do so the rights of *bona fide* purchasers will be affected although there are a few authorities to the contrary: 2 Story's Eq. Juris., § 983.

9. The defendants mortgage companies were put on notice of the contents of the deeds recorded and of the interests legal and equitable created by such instruments. These defendants had no knowledge nor were they put on inquiry to ascertain the present contentions of the plaintiffs as to mutual mistakes. The defendant mortgagees are *bona fide* purchasers for value, and it is elementary that reformation cannot be had as against such *bona fide* purchasers: 34 Cyc. 955, 958; 23 R. C. L., p. 339, § 33; 44 A. L. R. 79, annotations; *Hallberg* v. *Harriet,* 93 Or. 678, 683 (184 Pac. 549). We therefore conclude that the plaintiffs are not entitled to have the instruments reformed as prayed for.

Plaintiffs submit that the deeds in question, without any extrinsic evidence, should be construed so that the use of the term, ''heirs of the body,'' referred to children and were intended as words of purchase and

not as words of limitation, and that Mrs. Hulen took a life estate only.

Defendants contend that the deeds in question convey a conditional fee to Sarah L. Hulen, and that as she had heirs of her body then living, the condition was performed so that the conditional fee became absolute.

In *Pierson* v. *Lane,* 60 Iowa, 60 (14 N. W. 90), cited and discussed in *Sagers* v. *Sagers,* 158 Iowa, 729 (138 N. W. 911, 43 L. R. A. (N. S.) 562, 563), the conveyance was to Minerva Pierson and "the heirs of her body begotten by her present husband * * To have and to hold the above granted and bargained premises * * unto the said Minerva Pierson and the heirs of her body begotten by said husband." And it was there held that the grant created a conditional fee under the common law. Under the common law, before the enactment of the statute *de donis* (13 Edw. 1, Chap. 1), it was held that such a conveyance created a conditional fee, because, if the grantee died without having the specified heirs, the land reverted to the grantor. As soon, however, as the specified heirs were born, the estate became absolute, and the grantee could eliminate it. This rule was adopted by the court in *Pierson* v. *Lane* and it was held that, as Minerva Pierson had the requisite heirs, she took an absolute fee, and could alienate the land. In *Kepler* v. *Larson,* 131 Iowa, 438 (108 N. W. 1033, 7 L. R. A. (N. S.) 1109), we distinctly said that conditional fees, as they existed before the enactment of the statute *de donis,* prevailed in this state.

Blackstone's definition of a conditional fee is as follows:

"A conditional fee, at the common law, was a fee restrained to some particular heirs, exclusive of others * * as to the heirs of a man's body, by which only his lineal descendants were admitted, in exclusion of collateral heirs, or to the heirs male of his body, in exclusion both of collaterals, and lineal females also." 2 Blackstone Com., p. 110.

In 4 Kent's Commentaries a conditional fee is thus defined (* 11):

"A conditional fee is one which restrains the fee to some particular heirs, exclusive of others, as to the heirs of a man's body, or to the heirs male of his body. This was at the common law construed to be a fee simple, on condition that the grantee had the heirs prescribed. If the grantee died without such issue, the lands reverted to the grantor. But if he had the specified issue, the condition was supposed to be performed, and the estate became absolute, so far as to enable the grantee to alien the land, and bar not only his own issue, but the possibility of a reverter."

10, 11. A conditional fee is one which restrains the fee to some particular heirs, exclusive of others, as to the heirs of a man's body, or to the heirs male of his body. Such estate is held to be a fee simple on condition that in default of such issue it should revert to the donor. In a fee conditional the entire estate is in the donee, the donor having a mere possibility of reverter which he may release to the donee and thereby convert the estate into a fee simple absolute. The issue is not regarded as having any interest whatever.

12. As soon as any issue is born the estate is supposed to become absolute by the performance of the condition, "at least for three purposes: (1) To enable the tenant to alien the land and thereby to bar, not only his own issue, but also the donor of his interest

in the reversion; * * (3) to empower him to charge the land with rents, commons, and certain other incumbrances, so as to bind his issue'': 21 C. J. 924, 925, § 19; *Moody* v. *Walker,* 3 Ark. 147; *Shope* v. *Unknown Claimants,* 174 Iowa, 662 (156 N. W. 850); *Wright* v. *Herron,* 2 S. C. (5 Rich. Eq.) 441; *Adams* v. *Chaplin,* 10 S. C. (1 Hill Eq.) 265; 4 Kent. Com., p. 11; 2 Blackstone's Com. 110; *Croxall* v. *Shered,* 5 Wall. (U. S.) 268 (18 L. Ed. 572); *Coogan* v. *Jones,* 278 Ill. 279 (115 N. E. 877); *Frazer* v. *Peoria County,* 74 Ill. 282; *Kirk* v. *Ferguson,* 6 Coldw. (Tenn.) 479.

13. The presumption that the word "heirs" was used in its technical sense, is much harder to overcome in the case of deeds than of wills, for the reason that, while conveyances are usually made with the aid of counsel, wills frequently are not: *Kepler* v. *Larson,* 131 Iowa, 438 (108 N. W. 1033, 7 L. R. A. (N. S.) 1109), note, at page 1110. In that case it was held that a grant to one of a life estate, *habendum* to him during his natural life and to the heirs of his body, and their assigns in fee simple, conveys to him a fee under the rule in Shelley's Case, notwithstanding, the deed also provides that the wife of the life tenant shall have merely the privilege of living on the premises during his life, and neither the life tenant nor his wife shall have any power to convey, or place encumbrances on, the property.

That if a grant of a life estate to one *habendum* to him for life and the heirs of his body and his assigns in fee simple, should not be regarded as vesting a fee in the first taker, under the rule in Shelley's Case it conveys a conditional fee which in states where the statute *de donis* is not in force, may, after the birth

of a child to the life tenant, be conveyed by him in fee simple.

It was held that the rule in Shelley's Case was in force in that state, and the legislature had not seen fit to abrogate it; that the statute *de donis* being contrary to the spirt of its institutions had never been in force in Iowa.

Under our statute, Section 9847, Or. L., the term "heirs," or other words of inheritance, shall not be necessary to create or convey an estate in fee simple; and any conveyance of any real estate passes all the estates of the grantor, unless the intent to pass a less estate shall appear by express terms of the grant: *Ruhnke* v. *Aubert*, 58 Or. 11 (113 Pac. 38); *Irvine* v. *Irvine*, 69 Or. 189 (136 Pac. 18); *Love* v. *Walker*, 59 Or. 95, 105 (115 Pac. 296); *Tone* v. *Tillamook City*, 58 Or. 385 (114 Pac. 938).

14. Our statute relating to conveyances impliedly repeals statute *de donis conditionalibus*: *Rowland* v. *Warren*, 10 Or. 129. In that case there was a devise to Mary E. Hembree of certain lands with the provision at the end of the will "I further will that if my daughters Martha Ann and Mary E. Hembree die without children the land shall revert back to my other heirs." See *Bilyeu* v. *Crouch*, 96 Or. 66, 70 (189 Pac. 222, 223), where the Rowland case is interpreted by Justice BURNETT:

"In this state the question has been foreclosed by the early decision of *Rowland* v. *Warren*, 10 Or. 129. There the testator bequeathed certain realty to his youngest daughter Mary E. Hembree, 'to her and her body heirs forever,' and by a later clause in the will declared:

'I further will that if my daughters Martha Ann and Mary E. Hembree die without children, the land

shall revert back to my other heirs.' '' *Imbrie* v. *Hartrampf,* 100 Or. 589 (198 Pac. 521); *Love* v. *Walker,* 59 Or. 95 (115 Pac. 296).

In the Rowland case we also find the following at page 130 et seq. of 10 Or.:

"The question is, what estate did Mary E. Hembree take in the land? The first clause of the devise to Mary E. Hembree would give her a fee simple conditional at common law, and a fee tail under the statute *de donis.* The statute *de donis* converted the fee simple conditional into a fee tail by taking away the tenant's power of alienation. (4 Kent's Com., 11, 4; Sharwood's Blackstone, 110, n. 11.)

"Now if the tenant is given full power of alienation, the effect must be impliedly to repeal the statute *de donis.* (*Jewell* v. *Warner,* 35 N. H. 176.) Our statute concerning conveyances (Gen. Laws, t. 1, ch. 6, p. 514) seems, evidently, to confer this power, and to substitute a deed, signed and witnessed, for all common law conveyances whatsoever, including a common recovery. So our statutes in relation to the sale of land under execution for the payment of debts, and by executors and administrators for the payment of claims and charges against the estate, and the power to devise by will, seem clearly to design, and impliedly to enact, that all estates of inheritance are subject to a general power of alienation.

"A conveyance to A., and the heirs of his body, created a fee simple conditional at common law, which became a fee tail by the statute.

"The repeal of the statute *de donis,* simply, would restore the old fee simple conditional. Whether the power to create such an estate has, also, been taken away by our statute, of descents, or otherwise, it is not necessary in this case to determine. The devise in the first clause of the will, therefore, gave Mary E. Hembree either a fee simple absolute or a fee simple conditional. * *

"In *Ray* v. *Enslin,* 2 Mass. 554, there was a devise to the testator's wife for life, and after her decease unto

the testator's daughter and her heirs forever, but in case the daughter should happen to die after she came of age, or have lawful heir of her body begotten, then over. The court held the devise a fee simple, defeasible on a condition subsquent.''

The note in 29 L. R. A. (N. S.), p. 973, reads as follows:

''The rule is, when the ancestor takes an estate of freehold by any gift or conveyance, and in the same gift of conveyance there is a limitation, either mediate or immediate, to his heirs, or heirs of his body, the word 'heirs' is a word of limitation of the estate, and not of purchase. The remainder is immediately executed in possession in the ancestor so taking the freehold. *Baker* v. *Scott,* 62 Ill. 86.''

15. The deed of Mary A. Ramp to Sarah L. Hulen and the heirs of her body, only forever, of October 14, 1903, convey a fee-simple title to Sarah L. Hulen by reason of the fact that Sarah L. Hulen had heirs of her body, being the mother of the plaintiffs S. A. Lytle, A. D. Lytle, W. H. Lytle and Ed. A. Lytle and grandmother of plaintiffs Pearl Lytle and Ruby Thomas, children of her deceased son, the conditional fee became absolute, by performance of the condition, so that she was enabled to convey the land and thereby to bar her issue, the plaintiffs, her children and grandchildren: 10 R. C. L., p. 654, § 9; *Orndoff* v. *Turman,* 2 Leigh (Va.), 200 (21 Am. Dec., pp. 608, 609); 1 Thompson on Real Property, § 690, Vol. 4, §§ 3354, 3356; Washburn on Real Property (5 ed.), Vol. 1, p. 97; Tiffany on Real Property (2 ed.), Vol. 1, p. 52, § 23; *Carolina Tbr. Co.* v. *Holden,* 90 S. C. 470 (73 S. E. 869, 870); *Crawford* v. *Masters,* 98 S. C. 458 (82 S. E. 793).

16. The instrument of March 29, 1904, exhibit 2, was executed and recorded by Mary A. Ramp without

the knowledge or consent of Sarah L. Hulen. The title passed out of the mother to the daughter by the deed of October 14, 1903; the purported deed of March 29, 1904, is inefficacious for any purpose whatsoever: *Watson* v. *Smith,* 7 Or. 448; *Langley* v. *Kesler,* 57 Or. 281, 285, 286 (110 Pac. 401, 111 Pac. 246).

In the State of Oregon, the statute with reference to conveyance conferred the power of alienation and hence abolished the fee tail. Therefore, the estate known as the fee simple conditional at common law prior to the statute *de donis,* is recognized in this state, and a deed to one and the heirs of her body creates such an estate: *Rowland* v. *Warren,* 10 Or. 129; *Bilyeu* v. *Crouch,* 96 Or. 66, 70 (189 Pac. 222).

17. The deed to the Schmitke farm of date May 4, 1905, from Mary A. Ramp to "Sarah L. Hulen, during her natural life and after her death to the heirs of her body only" to hold forever, giving full effect to all the language thereof, she having heirs of her body living, conveyed a fee-simple estate in the land.

The common-law rule has been abolished in this state as to wills, Section 10119, Or. L., but not as to deeds, so that a deed to Mrs. Hulen for and during her natural life and after her death to the heirs of her body only, conveyed to her a fee-simple estate and that the plaintiffs, her heirs, take by descent and not as purchasers; in other words, their only interest in this property will be by inheritance; and Mrs. Hulen had the right to convey the fee or encumber it to any extent she desired.

The dye was cast by the enunciation in *Rowland* v. *Warren, supra.* The holding in that case sanctioned and followed in *Bilyeu* v. *Crouch, supra,* has become

a settled rule of property in the state of Oregon and should not be annulled.

"The common law of England and principles of equity, not modified by the statutes of Iowa or of this government, and not incompatible with its principles, shall constitute a part of the law of this land." Or. L. 1843, 49, p. 100, Act of June 27, 1844.

The foregoing statute continued and remained in effect when the Constitution of Oregon was adopted in 1859. Article XVIII, Section 7 of the Oregon Constitution provides:

"All laws in force in the territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force until altered or repealed."

Hence the Act of June 27, 1844, and Section 7 of Article XVIII of the Constitution constitute a statutory and constitutional declaration that the common law of England, unless modified by the statutes of Iowa when the Act of June 27, 1844, was enacted, or subsequently modified by the statute of Oregon, and not incompatible with the principles of our government, shall constitute a part of the law of Oregon: *Peery* v. *Fletcher*, 93 Or. 43, 52 (182 Pac. 143); *In re Water Rights of Hood River*, 114 Or. 112, 166 (227 Pac. 1065).

In 2 Washburn on Real Property (5 ed.), page 616, we read the following:

" * * that if one makes a limitation to another for life, with a remainder over mediately or immediately to his heirs, or the heirs of his body, the heirs do not take remainders at all, but the word 'heirs' is regarded as defining or limiting the estate which the first taker has, and his heirs take by descent, and not by purchase."

On page 646 et seq. the same author states:

"While in form the estate has two parts, a particular one for life, with a contingent remainder to the heirs of the tenant who takes the particular estate, it is constructively a single estate of inheritance in the first taker. The form of limitation of such estates is to the grantee or devisee for life, and after his death to his heirs, or the heirs of his body, either mediately or immediately, both estates being created by the same deed or devise. This rule, instead of regarding a part of the entire estate as in the ancestor, and a part in his heirs, considers the entire estate as being in him alone; that the intent in creating it was to have it go in a certain line of succession, and, if the first taker died intestate, his heirs should take by descent from him, and not as purchasers under the original limitation. * * it has been a rule of the common law, not merely of construction, but of imperative obligation, that if an estate is limited to one for life, and by the same gift or conveyance it is limited to his heirs in fee or in tail, the word 'heirs' is a word of limitation of his, the first taker's estate, and that heirs under such a deed or gift would have no greater interest or right than the heirs of any grantee in fee where an estate is given generally to him and his heirs."

And also on page 647:

"It was at first understood, that, in case of such limitation, the estate was in fact to go to the heirs of the grantee named; that though he had a right to enjoy it during life, he had no right to cut off the descent by alienation; and that when, therefore, the word 'heirs' in the progress of estates, came to be regarded as a mere term of limitation, giving the grantee a complete ownership, with an unrestricted right of alienation, it was not easy to distinguish between a case where the limitation was to one and his heirs, and that where it was to him for life, and, after his death, to his heirs to the effect and common law being the same in both forms of limitation."

There is nothing in the rule inconsistent with the genius of our institutions. It conforms with the liberal and commercial spirit of the age. It checks the disposition to lock up property and render it inalienable: 4 Kent's Com., p. 249; 24 R. C. L., p. 887; *Polk* v. *Faris,* 9 Yerg. (Tenn.) 209 (30 Am. Dec. 400). See notes 29 L. R. A. (N. S.), p. 963 et seq.

One of these notes on page 975 of 29 L. R. A. (N. S.), reads thus:

"When the ancestor by any conveyance takes an estate for life with remainder, mediately or immediately, to his heirs, in fee or in tail, the estate shall vest absolutely in the first grantee or devisee, and no estate remain which is secured by the deed to the heirs. In other words, the term 'heirs' in such case is to be regarded as one of limitation, and not of purchase." *Smith* v. *Hastin,* 29 Vt. 240.

To the same effect see *Patterson* v. *Jackman,* 51 Ind. 283; *Lytle* v. *Beveridge,* 58 N. Y. 592; *Crockett* v. *Robinson,* 46 N. H. 454; *Handy* v. *McKim,* 64 Md. 560 (4 Atl. 125); *Wolfer* v. *Hemmer,* 144 Ill. 554 (33 N. E. 751); *Scott* v. *Brin,* 48 Tex. Civ. App. 500 (107 S. W. 565); *Carpenter* v. *Van Olinder,* 127 Ill. 42 (19 N. E. 868, 11 Am. St. Rep. 92, 2 L. R. A. 455); *Hageman* v. *Hageman,* 129 Ill. 164, 167 (21 N. E. 814).

Fearne on Cont. Remainders, Vol. I, at page 27, treats the question in the following manner:

"Upon the first of these grounds we are to observe, that wherever the ancestor takes an estate of freehold, or frank tenement, and an immediate remainder is thereon limited in the same conveyance to his heirs, or heirs in tail, such remainder is immediately executed in possession in the ancestor so taking the freehold, and therefore is not contingent or in abeyance: as an estate for life to A. remainder to the heirs of his

body, this is not a contingent remainder to the heir of the body of A. but an immediate estate tail in A.''

Note (L) on page 27 of the same volume:

''Where land is limited to a person for his life, and after his decease to his heirs, or to the heirs of his body, the second limitation might be thought to have an appearance of giving the heir an estate by purchase, or an original estate, primarily vested in himself, and not claimed by him derivatively through his ancestor. For, as the land is expressly limited to the ancestor for his life, it might seem contrary both to the expression of the deed and the intention of the grantor, that the ancestor should take a larger estate; and as no person can have an heir during his life, the heir being the individual on whom the law casts the succession at the instant of the ancestor's decease, it might be thought that, where an estate is limited to a person expressly for his life, and after his decease, to his heirs, the limitation to the heirs must necessarily be contingent during the ancestor's life.

''In either supposition, there would be ground to contend that the heirs should take an estate of inheritance by purchase; and the limitation to the heirs would then ·fall within Mr. Fearne's fourth class of contingent remainders, being a limitation in remainder to a person not being or not ascertained.

''But by a rule of law of early antiquity, it is settled that, in all these cases, the remainder to the heirs is immediately executed in the ancestor, and therefore is not contingent or in abeyance.''

In the present case all the circumstances indicate that the intent of Mary A. Ramp at the time of the execution of the deeds was that the deeds should have such effect as accords with the established rules of law governing conveyances. The words ''heirs of her body, only,'' are words of inheritance and not of

purchase: *Duckett* v. *Butler,* 67 S. C. 130 (45 S. E. 137); *Holman* v. *Wesner,* 67 S. C. 307 (45 S. E. 206).

In short, Mary A. Ramp was the owner in fee simple of the real estate involved. She executed a deed to Sarah L. Hulen, her daughter, and the heirs of her body, only forever, by which she conveyed all of the estate which she had in the land with the possibility of a reverter in the event that Sarah L. Hulen had no heirs of her body. All of the title having passed from Mrs. Ramp, and the heirs having or taking no title until after the death of the grantee, Sarah L. Hulen, the title in fee upon her having heirs of her body resided in the first taker, Sarah L. Hulen, and she could alienate the same. It was the apparent intention of Mary A. Ramp to convey such title.

It follows that the decree of the Circuit Court should be affirmed.

It is so ordered.                          AFFIRMED.

BROWN, J., concurs in the result.