Submitted on briefs June 12, modified December 4, 1957

# CRAHANE ET AL *v.* SWAN

## 318 P. 2d 942

Weatherford & Thompson, Albany, filed briefs for appellant.

Melvin Goode, Albany, filed a brief for respondents other than Owens and Seguin (who did not appear).

WARNER, J.

This suit is brought by the plaintiffs-respondents, as partners, doing business as Forest Products Company of Oregon, hereinafter called Forest Products, for specific performance of a contract for the purchase and sale of real property, wherein the defendant Maggie Cameron was the vendor. Their prayer is for damages in the amount of $40,781, less the amount of $13,778.79, as an abatement of the balance due on the purchase price and with further credit to defendant of $2,556, being the net damages accruing as result of this court's holding in *Seguin v. Maloney*, 198 Or 272, 253 P2d 252, 256 P2d 514.

It appears that after the trial and before the entry of the decree, defendant Maggie Cameron died and L. L. Swan, as executor of her estate, was substituted in her stead. In view of the fact that defendants Alfred J. Owens and Ed Seguin did not appeal, we will refer to Mrs. Cameron and her substituted executor as the defendant.

The defendant filed a cross-complaint seeking reformation of what will later be described as the Owens contract. From a decree in accordance with the prayer of plaintiffs' complaint (and denying reformation), the defendant appeals.

Prior to August, 1945, C. C. Cameron was the owner of the real property and the timber located thereon, situated in Linn County, and which is the subject of the several contracts in issue. Thereafter, Mr. Cameron during his lifetime or after his death in 1946, his wife, as his sole heir and devisee, contracted to sell from time to time various parcels of their holdings, selling timber only to certain vendees and land, with or without the timber, to others. These transactions furnish the genesis of the instant suit.

Our interest, however, centers upon 144 timbered acres in the southeast quarter of Section 16, Township 13 South, Range 2 West of the Willamette Meridian.

We begin by setting up in chronological order the various contracts and other instruments evidencing the sales and transfers which are directly or indirectly involved in the matter at bar. They are:

August 3, 1945: By a purchase and sale contract the Camerons sold to H. L. Maloney and J. L. Chambers certain land, and in addition thereto, *standing timber* on approximately 1,200 acres of additional lands, but not including land or timber on the southeast quarter of section 16. We will refer to this as the Maloney-Chambers contract;

June 18, 1946: By purchase and sale contract Cameron sold to Charles F. Dill the *timber standing* on the southeast quarter of section 16, which included the controverted 144 acres, and also other property nearby. This we will call the Dill contract;*

June 17 [sic], 1946: Dill sells the timber on the challenged 144 acres to Maloney-Chambers;

July 8, 1947: The defendant contracted to sell Alfred J. Owens 2,024 acres *of land,* which included the land from whence her husband had sold the timber under the Maloney-Chambers and Dill contracts. We shall call this the Owens contract. It is the instrument which the defendant seeks to reform;

May 20, 1949: Owens sold his interest in the Owens contract to Seguin, who, on the same date, gave Forest Products Company, Ltd., a three-year option on the interest he acquired;

June 1, 1949: Forest Products Company, Ltd. (predecessor to the present plaintiffs), assigned its option rights in the Owens contract to the plaintiffs, as partners, doing business as Forest Products

---

* (Neither the Maloney-Chambers contract nor the Dill contract were ever recorded. All contracts and subsequent assignments were for a valuable consideration.)

Company of Oregon, hereinafter called Forest Products;

October 28, 1950: Seguin and Forest Products brought a suit to enjoin Maloney-Chambers from cutting timber on the subject 144 acres. Forest Products then was composed of the same partners who are plaintiffs-respondents here; and on

May 25, 1953: This court rendered its decision in the suit last referred to. Cf. *Seguin v. Maloney-Chambers Lumber Co.*, 198 Or 272, 253 P2d 252, 256 P2d 514.

The position of Forest Products is that they acquired their interest in the Owens contract without notice of the claim of Maloney-Chambers to cut the timber on the 144 acres. Maloney-Chambers, since the decision in the Seguin case, supra, have denuded that acreage of its merchantable timber. This occasions plaintiffs to demand judgment for the value of that timber in the amount of $40,781, less $13,778.79 as the balance due on the Owens contract. We have earlier indicated that such was the decree of the trial court, together with a direction for specific performance on the part of the defendant.

The defendant presents six assignments of error. Inasmuch as several of them so relate to and impinge upon others in subject matter, we will restate them as four propositions: (1) Did the court err in refusing to reform the Owens contract? (2) Did the court err in finding that Forest Products acquired the vendee's interest in the Owens contract without notice of the interest of Maloney-Chambers in the timber on the 144 acres? (3) Did the court err when it refused to measure Forest Products' damages in the amount of the purchase money paid on the contract instead of assessing, as it did, damages for the loss of bargain suffered by Forest Products as assignee

of Owens, the vendee, resulting from the timber cut by Maloney-Chambers on the 144 acres. And, lastly, is defendant entitled to a further credit for an amount equal to the value of timber cut during 1946 and prior to the date of the Owens contract?

We will consider these contentions of the defendant in the order above stated and first address our attention to the question of

## *Reformation*

The defendant by her cross-complaint claims that it was her intention, as the seller, and the intention of the purchaser, Owens, that the Owens contract was one solely for a sale and purchase of land without timber. Part of which timber, we have seen, had been previously sold to Maloney-Chambers under the Maloney-Chambers contract and another part had been sold to Dill under the Dill contract, with Dill's interest being later acquired by Maloney-Chambers. The Owens contract was drawn and executed by Mr. Swan, as Mrs. Cameron's attorney-in-fact and presently the executor of her estate. As signed by the parties, the only provision it contained respecting outstanding timber rights, reads:

> "It is understood that this contract is made subject to the rights of Maloney and Chambers to remove the timber on the 1200 acres herein described, to build a pond for storage of logs and right of way to the county highway for a period of eleven years from October 1, 1947."

But no reference was made, directly or indirectly, to the Dill contract.

The defendant now seeks to improve that exception by the insertion of the word "as" after the word "timber" and before the word "on" in the foregoing

provision as it was originally written. The defendant argues that it will then read as originally dictated by Mr. Swan to his office stenographer. The defendant further claims, if it had been so written it would clearly convey notice to all persons of the outstanding rights under the Dill contract to cut timber on the 144 acre tract. In our opinion, the insertion of the word "as" would not have accomplished that result. At best, it would only create an ambiguity of a character defeating the intent of the scrivener.

Assuming, however, that it would have served the purpose claimed for it, the record does not indicate to us that it supports appellant's prayer for reformation. We need not fortify this conclusion with our reasons therefor, inasmuch as we are of the opinion that no matter how apparently meritorious would be the defendant-appellant's claim of mutual mistake as between Mrs. Cameron and Mr. Owens, she is not entitled to demand a reformation in this suit.

■ It is an almost universal rule of equity not to grant relief by way of reformation to the injury of innocent third persons such as bona fide purchasers, lien holders and others who without notice have acquired intervening or vested rights and who cannot be placed in statu quo. It is an unalterable rule of equity that such an innocent third person will not be affected by a latent equity, and in that respect the equity to reform stands on the same footing with any other equity. 45 Am Jur 624, Reformation of Instruments § 68; 19 Am Jur 75, Equity § 55; 76 CJS 410, Reformation of Instruments § 59; 2 Restatement 968, 979, Contracts §§ 504, 509(2) ; 5 Williston on Contracts (rev ed) 4336, 4339, §§ 1547, 1548; 3 Pomeroy's Equity Jurisprudence (5th ed) 106, § 776; 3 Elliott on Contracts 552, § 2381. Also see Annos 44 ALR 78.

The rule applies with equal force in the reformation of contracts for purchase and sale. 19 Am Jur 76, Equity § 56; 76 CJS 338, Reformation of Instruments § 13.

This court is committed to the same rule respecting the right of intervening third parties. See *Lytle v. Hulen*, 128 Or 483, 275 P 45, 114 ALR 587, and *Hallberg v. Harriet*, 93 Or 678, 184 P 549.

*Morris v. Hillman Inv. Co.*, 99 Wash 276, 169 P 837, in its basic facts is substantially like those present in the instant matter in so far as the right to reformation is concerned and furnishes an outstanding example of a deserving application of the rule that equity will not decree a reformation when it will result in injury of innocent third parties.

The Morris case, supra, turns on the right to reform a real estate contract executed by the defendant, Hillman Inv. Co., as vendor, and one McIntyre, as purchaser. Their contract, after stipulating a purchase price of $1,435.88, recited a credit payment of $750 to that price. Very shortly after, McIntyre assigned his interest in the contract to the plaintiff Morris for a valuable consideration. Morris went into possession, completed the installment payments to defendant on the balance due after allowing for the $750 credit and demanded a deed which was refused by the vendor. Morris then brought suit for specific performance. The defendant Hillman Inv. Co. by its cross-complaint sought reformation by deleting the $750 credit on the ground that its inclusion constituted mutual mistake between himself and the vendee McIntrye. The opinion reveals that McIntyre well knew or should have known of the mistake when made but that Morris, as McIntyre's assignee, had no knowledge of the claim of error until he demanded his deed. It further ap-

pears that the contested instrument was drafted by the vendor and the figures for the purchase price and erroneous credit supplied from data in its possession. In confirming the trial court's denial of reformation, the Supreme Court said:

"\* \* \* With full knowledge of respondents' [Morris as assignee of McIntyre] possession and reliance on the contract, the appellant [Hillman Inv. Co.] made no effort to discover or rectify the mistake which it had made \* \* \*; nor did it seek a reformation of the instrument until more than two years after respondent had called its attention to the variance between his contract and the ledger account of the appellant. In fact the reformation was never sought until after tender made and suit begun by respondents for specific performance of the written agreement. This notwithstanding the self-evident fact that the appellant, by exercising the degree of care and diligence which the ordinary individual exercises in matters of like importance, would have discovered and appreciated the mistake of which it now complains, long prior to the time when the status of the account was called to its attention by the respondents. \* \* \*" (169 P 840, supra)

The court then proceeds to invoke the rule respecting innocent third persons, saying:

"\* \* \* It would in fact inflict an injury upon innocent parties as the result of an act of which they had no knowledge and for which they were in no wise responsible, and this at the instance of one who would thus lately invoke equity as a relief from its own careless and negligent act. \* \* \*" (169 P 840, supra)

The record here reveals Mr. Swan's unique position of close and long-continuing familiarity with all phases of the contract in litigation. His background of more than 60 years as an active member of the bar,

together with his substantial and exacting business interests, including the presidency of banks in two of the smaller towns of Linn County, heightens his responsibility in the premises and our expectation that a man of such legal and business experience would hasten the correction of such an error and mistake when it first became evident to him. For sometime prior to the execution of the Owens contract, Mr. Swan had acted as attorney for Mr. Cameron and in that capacity had drawn for him the Maloney-Chambers contract. He had at hand copies of the Dill contract and Maloney-Chambers contract when he drew the Owens contract. After Mr. Cameron's death, he not only served Mrs. Cameron as legal counsel, but was also her attorney-in-fact when he closed the negotiations for the sale to Owens. These resulted in the agreement the defendant seeks to reform seven years after Mr. Swan executed the same in behalf of Mrs. Cameron. Thereafter, the contract was before Mr. Swan twice for modifications drawn by him and again executed by him as attorney-in-fact for the vendor. The first modification was made September 1, 1947. This substituted certain parcels of land in lieu of others. The second modification was made September 1, 1948. This eliminated certain property described in the original Owens contract. Later, and on October 22, 1951, Swan and his wife conveyed to Mrs. Cameron by bargain and sale deed the very 144 acres in controversy and which was a part of the land from whence timber was sold under the Dill contract, thus revealing a personal interest in all of these transactions. It is noteworthy that the Swan deed made no reservation for timber.

Moreover, for the period from the execution of the Owens contract down to and including August 30,

1950, Mr. Swan received and receipted for all moneys paid thereon and noted such payments on Owens' copy of that contract. By his own testimony, he had knowledge of the pendency of the *Seguin v. Maloney-Chambers* case, supra (198 Or 272), wherein Seguin, as the assignee of Owens, contested any rights of Maloney-Chambers to the same 144 acres in which we are presently interested. The trial of that case began December 21, 1950, and was ultimately determined here in April, 1953.

But notwithstanding these things, neither Mrs. Cameron nor Swan, as her lawyer and attorney-in-fact, during this time made any effort to reform the Owens contract as is now asked by the cross-complaint, a pleading in which there is no allegation that Forest Products, as the second assignee of the purchaser's interest in the Owens contract, had any notice or knowledge, actual or constructive, of the alleged mistake now sought to be reformed. We also think it is a matter of interest to note that defendant's first answer filed in this matter and later made one of plaintiff's exhibits, said nothing concerning reformation, when it was then, if not an afterthought, one of its prime defenses.

This record represents a delay of more than seven years by the defendant as against the four years lapse deplored in the Morris case. It discloses absolute silence and inactivity on the part of Swan or his client for more than two years after Swan claims that knowledge of the alleged mistake was brought to his attention.

For the same reasons given by the Washington court in *Morris v. Hillman Inv. Co.,* supra, i.e., an unconscionable delay, concerning a mistake for which plaintiff had no knowledge or responsibility and which

reformation, if allowed, would inflict an injury on innocent third parties, we, therefore, dismiss defendant's petition for reformation as having no merit.

We now direct our inquiry to appellant's representation that the plaintiffs had

### Actual and Constructive Notice

of the existence of Maloney-Chambers' right as sub-assignee of the Dill contract.

The defendant neither pleads nor asserts in her brief that any of the plaintiffs had personal notice, actual or constructive, of the existence of the Dill contract. The defendant asserts that Owens had notice, actual or constructive, of the Dill timber contract when he executed the Owens contract, as the purchaser of the land, and, therefore, such notice as he had is to be imputed to his assignees, thereby preventing his successors in interest from any relief they now seek.

The appellant cites *Wetherby v. Griswold*, 75 Or 468, 147 P 388, relying on the rule found at page 475 as quoted from 37 Cyc 742 and reading:

"If the purchaser at the time of entering into the contract was aware of the defect in the vendor's interest or title, or deficiency in the subject-matter, he is not, on suing for specific performance, entitled to any compensation or abatement of price."

■ The foregoing rule is, however, subject to an exception: When the written contract between the parties provides that the vendor shall convey the premises free from encumbrances, it is immaterial that the purchaser had notice at the time of the contract that there was an encumbrance on the property. The purchaser has a right to insist upon the terms of his contract. The vendor, agreeing to sell land, is bound to know whether he has title, and is answerable if he is

unable to fulfill his contract, for a vendor who agrees to convey land at a time when he knows he has no right to convey assumes the risk of acquiring title and making the conveyance or responding in damages for the vendee's loss of his bargain. 81 CJS 612, Specific Performance § 91; Maupin, Marketable Title to Real Estate (3d ed), 207 § 85-a; 55 Am Jur 945, Vendor and Purchaser § 553; *Sanford v. Wheelan,* 12 Or 301, 306, 7 P 324; *Caveny v. Asheim,* 202 Or 195, 223, 274 P2d 281; *Weiss v. Binnian,* 178 Ill 241, 52 NE 969. Also see *Lavey v. Graessle,* 245 Mich 681 (1929), 224 NW 436; *City of Beaumont v. Moore,* 146 Tex 46 (1947), 202 SW2d 448.

The Owens contract carries this provision:

"Party of the first part covenants when all said payments have been made and the other agreements herein set out kept and performed that she will make and deliver to party of the second part, his heirs or assigns, a deed containing the usual covenants of warranty conveying said premises in fee simple and free from all incumbrances, except such as may be suffered or permitted by party of the second part and deliver Abstract of Title brought to date of deed, or abstracts for the part and Title Insurance for the part thereof, showing party of the first part vested with marketable title and free from incumbrances except such as may be suffered or permitted by party of the second part."

■ Under the circumstances, such knowledge, if any, that Owens may have had of the Dill contract or the Maloney-Chambers interest thereunder becomes a matter of no persuasive weight in the defendant's favor and leaves her estate liable to damages for breach of covenant on the petition of Forest Products for specific performance.

The proper

## Measure of Damages

in the instant matter, therefore, becomes the next item for resolution.

We have previously observed that the trial court assessed damages in the amount of $40,781, less the unpaid balance of the purchase price then currently due under the Owens contract.

In so disposing of plaintiffs' claim for relief, the court invoked as the measure of damages the rule commonly known as the loss-of-bargain rule, sometimes designated by some writers as the American rule for damages on breach of an executory contract. McCormick, on Damages 680 § 177. This rule proximates the universally prevailing rule as the measure for damages on breach of contract for the sale of personalty.

The appellant urges that the court was in error in applying the loss-of-bargain rule and, to the contrary, should have assessed damages pursuant to the good-faith-vendor rule, which is sometimes described as the English rule. McCormick, supra, at p 680. Although not limited to executory contracts, it is more familiarly applied as the measure of damages accruing on breach of stipulation or warranty of an executed contract. If applied to the instant matter, the measure of plaintiffs' damages would be limited to a recoupment of the moneys paid to the purchase price, with interest, but with no recovery for their loss of bargain.

■ We think, however, that the rule employed by the trial court was not only the apt one, but the only one which it could apply in this jurisdiction, in view of our previous decisions, and as the prevailing rule in a large number of other jurisdictions. See Anno 48

ALR 14, II b; 48 ALR 17, II c; Anno 68 ALR 140, II b and c.

Beginning with *Neppach v. Or. & Cal. R. R. Co.*, 46 Or 374, 80 P 482 (1905), after an exhaustive presentation of authorities by the respective proponents for the vendor-in-good-faith rule and the loss-of-bargain rule, Mr. Justice ROBERT BEAN followed and applied the latter rule as defined by 2 Warvelle, Vendors (2d ed) § 936, reading:

"* * * Mr. Warvelle says, in speaking on the subject of the measure of damages in an action by a vendee against a vendor for the breach of a contract to convey real estate: 'The rule is well established that where the vendor has title, *and for any reason refuses to convey it,* as required by the terms of the agreement, he shall respond in damages, and make good to the vendee whatever he may have lost by reason of the breach. So far as money can do it, the vendee must be placed in the same situation with regard to damages as if the contract had been specifically performed; and the measure of such damages will ordinarily be the difference between the contract price and the value of the property at the time of the breach. This has always been regarded as the true measure of damages in actions on contracts for the future delivery of marketable commodities, and it makes no difference in principle whether the contract be for the sale of real or personal property. In both instances the vendee is entitled to have the thing agreed for at the contract price, and to sell it himself at its increased value, and if it be withheld the vendor should make good to him the difference': * * *." (Emphasis ours.) (*Neppach v. Or. & Cal. R. R. Co.,* supra, p 399 et seq)

The foregoing has been the settled rule ever since the Neppach case in matters of this kind. *Jennings v. Oregon Land Co.,* 48 Or 287, 290 (1906), 86 P 367;

*Cameron v. Edgemont Investment Co.*, 149 Or 396, 407 (1935), 41 P2d 249; *Reddick v. Magel,* 184 Or 270, 279 (1948), 195 P2d 713, 197 P2d 683. Also see *Mackey v. Olssen,* 12 Or 429, 8 P 357. The defendant cites no Oregon cases to the contrary, nor can we discover any after diligent search.

■ The rationale for the rule as used in this jurisdiction is clearly stated in the frequently cited case of *Doherty v. Dolan,* 65 Me 87, 20 Am Rep 677 (1876), where the court says, at p 91:

> "The pecuniary damages are the same to the vendee, whether the motive of the vendor in refusing to convey is good or bad. It is a difficult thing to ascertain whether or not a vendor is actuated by good faith in his refusal to convey. There can easily be frauds and deceits about it. The vendor is strongly tempted to avoid his agreement, where there has been a rise in the value of the property. The vendee, by making this contract, may lose other opportunities of making profitable investments. The vendor knows, when he contracts, his ability to convey a title, and the vendee ordinarily does not. The vendor can provide in his contract against such a contingency as an unexpected inability to convey. He can also liquidate the damages by agreement. The measure of relief, afforded by our rule, is a fixed and definite thing. The other rule is not easily applied to all cases, and the books are burdened with discussions and refinements in relation to the modifications and restrictions and qualifications which, in different jurisdictions, have been annexed to it."

Also see *Johnson v. Metropolitan Life Ins. Co.*, 219 NC 445 (1941), 14 SE2d 405, 407; McCormick on Damages, supra, at p 692.

We are impressed with the logic and fairness of the loss-of-bargain rule as employed in Oregon and

find no good reason to depart from or limit it in the manner suggested by the defendant.

The last question raised by the defendant relates to the

### Claim of Credit

The court computed plaintiffs' damage for removal of timber by Maloney-Chambers at the rate of $20 per thousand. It used the figure 2,039,055 feet as the total footage cut and thereby arrived at $40,781 as the damages sustained by the plaintiffs.

It appears, however, that 2,039,055 feet represents the total cut of Maloney-Chambers from the date of their first entry on the 144 acres for the purpose of logging that area up to September 24, 1953, the date of the filing of plaintiffs' complaint in this matter.

This initial entry was made sometime in the year 1946, and prior to the execution of the Owens contract, which was July 8, 1947. Until that date neither Owens nor the assignees of his interest in the Owens contract had any right or interest in the 144 acres or to any timber located thereon.

In the year 1946 the logging done on the premises by Maloney-Chambers was relatively small. The uncontradicted testimony discloses that 99,507 feet was felled by them that year, whereupon they suspended their logging operation on the 144 acres until sometime in 1950 and did not even return to remove the logs felled in 1946 until sometime in 1948.

■ The title to the timber felled in 1946 and removed in 1948 never passed under an actual or alleged sale to plaintiffs. The timber cut by Maloney-Chambers during 1946 became their personal property which they had a right to remove within a reasonable time

thereafter, whether they cut as licensees or as vendees under a purchase and sale contract. *Anderson v. Moothart,* 198 Or 354, 256 P2d 257; *Dunham v. Taylor,* 211 Or 618, 317 P2d 920.

■ Inasmuch as this 99,507 feet cut in 1946 was erroneously included in the court's calculations, the allowance in damages in the total amount of $40,781 should be reduced by $1,990.14, that is, to $38,790.86.

Affirmed as modified. Respondents to recover costs.