## CALIFORNIA–OREGON POWER CO. v. BEAVER PORTLAND CEMENT CO. et al.

### No. 6874.

Circuit Court of Appeals, Ninth Circuit.

Nov. 5, 1934.

WILBUR, Circuit Judge, dissenting in part.

A. E. Reames, of Medford, Or., for appellant.

John K. Kollock, of Portland, Or., and Gus Newbury, of Medford, Or., for appellees.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

MACK, Circuit Judge.

Plaintiff is the owner of land on the east side of the Rogue river, a meandering nonnavigable stream in Oregon, directly opposite land on the west side, the legal title to which is in defendant city of Gold Hill; defendant Cement Company has possession of the city's land under an executory contract of purchase. Ownership in each case extends to the thread of the stream. Pursuant to its plan to build a dam and power plant on the west side of the river, Cement Company exploded charges of dynamite in reefs in the river bed but entirely west of the thread of the stream, for the purpose of permitting a freer flow of water down the west side of the river and of securing an available supply of broken rock for the construction of the dam. Plaintiff, claiming that the prosecution of these operations would divert the water from its land on the east side of the river and interfere with its rights as a riparian owner on the stream, sought an injunction to prevent defendants carrying on further blasting operations, removing the blasted rock from the bed of the stream, and doing anything else that would change the bed of the stream or lessen the flow of water over plaintiff's side of the river bed. The injunction as prayed

for was denied but, to insure that some water would continue to flow down the plaintiff's side of the stream, defendants were enjoined from reducing the surface elevation of the water at the contemplated point of diversion below 1,070.056 feet above sea level. From this decree, plaintiff alone appeals.

Plaintiff's principal contentions are that by the rule of the common law a riparian owner on a nonnavigable stream has a vested right to the natural flow of the stream not substantially diminished or diverted from its natural course; that this rule of "continuous flow" was part of the law of Oregon when plaintiff's lands were acquired by its predecessors from the government in 1885; and that the vested property right thus created is protected as against changes in the Oregon law by the Federal Constitution. Defendants deny that the common law rule created vested claims of continuous flow; they base their own claims on adjudicated rights and permits under the Oregon Water Code of 1909 (Laws Or. 1909, p. 319).

1. This Code establishes a comprehensive system for the adjudication of water rights; there is therein provision both for the determination of existing rights and for the acquisition of new rights. Section 11 of the Code provides: "Upon a petition to the state engineer signed by one or more water users upon any stream, requesting the determination of the relative rights of the various claimants to the waters of that stream, it shall be the duty of the state engineer, if, upon investigation he finds the facts and conditions are such as to justify, to make a determination of the said rights. * * * In case suit is brought in the circuit court for the determination of rights to the use of water, the case may, in the discretion of the court, be transferred to the state engineer for determination as in this act provided." Or. Code Ann. 1930, § 47-601. In either case the determination of the state engineer does not become final until confirmed by the circuit court of the county in which the determination is had. Id. § 47-614. Section 45 of the Water Code provides: "Any person, association or corporation hereafter intending to acquire the right to the beneficial use of any waters shall, before commencing the construction, enlargement or extension of any ditch, canal or other distributing or controlling works, or performing any work in connection with said construction, or proposed appropriation, make an application to the state engineer for a permit to make such appropriation." Id. § 47-501. After the appropriation is com-

pleted, the party is entitled to a certificate of water rights, from the state engineer, like that granted after an adjudication. Id. § 47-508.

In the operation of its power plant, Cement Company purposes utilizing a maximum of 1,397 second feet of water. Of this amount, 295 second feet have been recognized in an adjudication under the Code; the other 1,102 second feet are covered by water permits issued by the state engineer under section 45. Plaintiff, although it denies that it was a party to that adjudication and therefore bound by that decree, does not contest defendants' right to use the 295 second feet. It contends, however, that that amount is now available to defendant without necessitating any change in the river bed. Defendants' permits for the other 1,102 second feet, plaintiff contends, are "mere options," which cannot justify interference with the rights of other riparian owners.

The District Judge, as an alternative ground for the denial of the injunctive relief sought, relied upon plaintiff's failure to avail itself of the procedure provided by the Water Code for the determination of its rights. An invitation to further proceedings in the state courts was thought by him to be implicit in the earlier opinion of this court in a related controversy between the same parties, City of Gold Hill v. California Oregon Power Co., 35 F.(2d) 317 (1929), in which the questions now at issue were expressly reserved from decision. Cf. Pacific Livestock Co. v. Silvies River Irr. Co., 200 F. 487 (C. C. A. 9, 1912).

The procedure established by the Water Code is in part at least administrative; it has been sustained in that aspect against constitutional attack both by the Oregon courts and the United States Supreme Court. In re Willow Creek, 74 Or. 592, 144 P. 505, 146 P. 475 (1914); Pacific Live Stock Co. v. Lewis, 241 U. S. 440, 36 S. Ct. 637, 60 L. Ed. 1084 (1916). Therefore the question arises whether or not plaintiff should have been relegated to the state tribunals on the principle that one who seeks injunctive relief in the federal courts must first exhaust the administrative remedies which the state provides. Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150 (1908); Porter v. Investors' Syndicate, 286 U. S. 461, 52 S. Ct. 617, 76 L. Ed. 1226 (1932). In both of these cases, the injunction was sought against the administrative body itself on constitutional grounds; in the instant case, the suit is between private parties and jurisdiction is based solely on diversity of citizenship. The principle of comity, which dissuades the federal court from enjoining the enforcement of state administrative determinations before they have been concluded, may be equally applicable, however, to justify a refusal to entertain a private suit which would in effect check or prevent the functioning of the administrative body. The decree of the court might in such a case conflict with adjudications by the administrative body of other water rights on the same stream and thus create just such a chaotic condition as the administrative determination of the water rights is designed to prevent.

In Oregon a suit involving water rights may be instituted in the state circuit court, and in the discretion of the court, the issues may be referred to the state engineer for preliminary determination. But the circuit court, whether in reviewing the state engineer's determination or in making an original disposition of the suit, is not acting in an administrative capacity; its determination is res adjudicata as to all parties and issues properly before it. Abel v. Mack, 131 Or. 586, 283 P. 8 (1929); Cf. In re Waters of Walla Walla River, 141 Or. 493, 502, 16 P. (2d) 939, 943 (1932). To compel plaintiff first to establish its rights in the circuit court of the state would therefore result in denying it entirely its right to begin proceedings in the federal courts. Cf. Railroad and Warehouse Commission v. Duluth Street Ry. Co., 273 U. S. 625, 47 S. Ct. 489, 71 L. Ed. 807 (1927); City Bank Farmers' Trust Co. v. Schnader, 291 U. S. 24, 54 S. Ct. 259, 78 L. Ed. 628 (1933). Whether the circuit court would be required to refer such a case as this to the state engineer for preliminary determination is at least doubtful. It has been reversed for failure to do so when the evidence was conflicting and the rights of those not party to the suit were likely to be affected. Oregon Lumber Co. v. East Fork Irrigation District, 80 Or. 568, 157 P. 963 (1916); Pacific Livestock Co. v. Balcombe, 101 Or. 233, 199 P. 587 (1921). But in the instant case, the rights of only the immediate parties are involved. Moreover, it is doubtful whether the administrative procedure provided by the state is adapted to the determination of such claims as those of plaintiff. The function of an adjudication under the Code is primarily to allocate definite quantities of water on the basis of prior or contemplated use. Plaintiff, however, claims the right to an indefinite quantity of water, namely the natural flow of the stream, on the basis of its riparian own-

ership. As the Oregon court has said: "By reason of the fact that the old riparian right doctrine does not provide for a fixed quantity of water to be apportioned to different persons or tracts of land, the rule * * * cannot be worked out or applied under the Water Code of 1909 in the adjudication of the relative rights of the various claimants to the use of water of a stream system." Re Water Rights of Hood River, 114 Or. 112, 162, 227 P. 1065, 1081 (1924).[1]

Thus plaintiff stands on rights alleged to have become vested independently of the Water Code and the procedure thereby established. In the light of all of these considerations, we conclude that the principle that one must exhaust the administrative remedies provided by the state before seeking injunctive relief in the federal court is inapplicable to the instant case.

2. Plaintiff contends that its right as riparian owner to have the stream continue to flow substantially undiminished in its natural channel is established by Weiss v. Oregon Iron & Steel Co., 13 Or. 496, 11 P. 255 (1886) and other cases. In the Weiss Case, an upper riparian owner was enjoined from diverting water permanently for manufacturing purposes and thus diminishing substantially the flow of water to the lands of the plaintiff, a lower riparian owner. The court said: "The defendant, as riparian owner, has a right to the use of the stream for its own necessary uses; but this right must be reasonably exercised, and there must be no substantial diminution or waste. * * * What is a reasonable use must necessarily depend upon the facts, considering the size of the stream and the amount appropriated. But all the authorities concur that when the amount abstracted perceptibly or materially diminishes the quantity of the stream, such use of it by a riparian owner is unreasonable, and an infringement on the rights of other riparian owners, for which the law furnishes redress. The plaintiff is entitled to have the natural flow of the water, in its accustomed channel, subject only to the diminution and retardation incident to a reasonable use." 13 Or. at page 500, 11 P. at page 257. This rule of natural or continuous flow was also applied in Cox v. Bernard, 39 Or. 53, 64 P. 860 (1901), and Mace v. Mace, 40 Or. 586,

67 P. 660, 68 P. 737 (1902). At the same time, however, rights acquired by appropriation while a stream was flowing through public lands were recognized as superior to riparian rights subsequently arising. Carson v. Gentner, 33 Or. 512, 52 P. 506, 43 L. R. A. 130 (1898); Brown v. Baker, 39 Or. 66, 65 P. 799, 66 P. 193 (1901). It was also said to be "established doctrine in this state that a settler upon public lands * * * may claim the use of water, either as a riparian owner or as an appropriator, but he cannot do both. The exercise of one right is in substance a waiver of the other." Caviness v. La Grande Irr. Co., 60 Or. 410, 421, 119 P. 731, 735 (1911).

In Hough v. Porter, 51 Or. 318, 95 P. 732, 98 P. 1083, 102 P. 728 (1909), the court thoroughly considered the effect on Oregon water law of the Federal Desert Land Act of March 3, 1877, 19 Stat. 377, 43 U. S. C. § 321 (43 USCA § 321). That act contained provision that "* * * all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights." This provision was interpreted as a permanent reservation and dedication to the public, with the result that "all lands settled upon after the date of the latter act were accepted with the implied understanding that (except as hereinafter stated) the first to appropriate and use the water for the purposes specified in the act should have the superior right thereto." 51 Or. at page 399, 98 P. at page 1095. The exception later stated was that appropriators would not be permitted so far to deplete the flow as to deprive a riparian owner of water essential for his domestic needs. 51 Or. at page 404, 98 P. at page 1097. So long as this right of domestic use was not infringed, the riparian owner whose lands had been settled after the act could not object to an appropriation of water which diminished the flow of the stream.

The Oregon Water Code, adopted in 1909 after the decision in Hough v. Porter, does not specify what consideration, if any, is to

---

[1] Cf. In re Water Rights of Deschutes River and Tributaries, 134 Or. 623, 685, 703, 286 P. 563, 585, 294 P. 1049, 1051 (1930), appeal dismissed (as taken too late); Columbia-Deschutes Power Co. v. Stricklin, State Engineer, 290 U. S. 590, 54 S. Ct. 83, 78 L. Ed. 520 (1933). The valuable briefs filed therein in the Supreme Court of the United States have been examined. The appellant urged among other contentions, the constitutional objections presented by plaintiff herein.

be accorded in the determination of water rights to a riparian owner merely because of such ownership. Section 1 provides: "Subject to existing rights, all waters within the state may be appropriated for beneficial use, as herein provided, and not otherwise; but nothing herein contained shall be so construed as to take away or impair the vested right of any person, firm, corporation, or association to any water." Or. Code Ann. 1930, § 47-402. Section 70 of the Water Code, in explanation of vested rights, provides: "2. Actual application of water to beneficial use prior to the passage of this act by or under authority of any riparian proprietor, or by or under authority of his or its predecessors in interest, shall be deemed to create in such riparian proprietor a vested right to the extent of the actual application to beneficial use." Id. § 47-403.

These and related provisions of the Code were definitely construed in Re Water Rights of Hood River, 114 Or. 112, 227 P. 1065, 1079 (1924), to abolish the rule of continuous flow contended for by plaintiff in the instant case. That was an adjudication under the Code, in which the Pacific Power & Light Company stood on its alleged right as a riparian owner to have the stream flow "undiminished by the acts or appropriations of others above its said lands, other than by the reasonable use thereof by upper riparian owners for watering live stock and for domestic purposes, and by the reasonable use by such riparian owners of the waters of such stream for the irrigation of lands actually riparian to said stream." By a four to three decision this claim was denied. Mr. Justice Bean, writing for the majority of the court, said: "The granting of the contention of the Pacific Power & Light Company, and going back to the old rule of 'continuous flow' of a stream, would take the heart out of the Water Code. * * *" 114 Or. at page 162, 227 P. at page 1081. He also expressed the opinion that the common-law rule under which "the riparian owner was entitled to the full flow of the stream through his land, except as the flow might be affected by a reasonable use made thereof by other riparian owners," had never been adopted to the full extent in Oregon. As to this, however, a majority of the court disagreed with him. Nevertheless, a majority held that the Water Code in any event had abolished the rule of continuous flow as to lands acquired before as well as those acquired after its adoption, and that the provision therein saving vested rights was limited to rights acquired through "actual application of water to beneficial use," as defined in section 70. A minority, on the other hand, were of the opinion that the Code could, and to avoid constitutional difficulties should, be interpreted so as to preserve as vested rights the riparian rights of proprietors of lands which had passed into private hands while the rule of continuous flow prevailed in Oregon.

3. The Hood River Case as well as Norwood v. Eastern Oregon Land Co., 112 Or. 106, 227 P. 1111, decided on the same day, involved lands which passed from the government prior to the Desert Land Act of 1877. In the instant case, plaintiff's rights date back only to 1885, the date of the government patent on which its title is based. We come, therefore, to the question of the interpretation of that act and primarily to the consideration of Hough v. Porter, supra.

The Desert Land Act was passed for the purpose of facilitating the settlement of the public domain arid land by permitting title to be acquired thereto by one who declared his intention of reclaiming it and who completed the reclamation within the prescribed period. The right to the use of water by one so conducting it upon desert land is limited to the "amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation"; then follows the provision relied on in Hough v. Porter that "all surplus water * * * together with the water of all lakes, rivers, and other sources of water supply upon the public lands * * * shall remain and be held free for the appropriation and use of the public. * * *" Of this provision, the court in Hough v. Porter, said: "This reservation of water rights for the benefit of the public was clearly not essential to any of the other provisions of the act. The previous statement contained sufficient to define and protect the rights of those selecting lands under the desert land act; but the added proviso, or something of similar import, was essential to the establishment of a clear and uniform rule upon the subject as regards all appropriations thereafter to be made from streams or other bodies of water upon the public lands and to which such might be riparian. The words 'shall remain and be held free for the appropriation and use of the public for irrigation,' etc., are clearly words of reservation and dedication, and obviously so intended." 51 Or. at page 386, 98 P. at page 1091.

This reservation and dedication, it was concluded, had the effect of permanently severing from the lands then owned by the gov-

ernment and subsequently granted by it, the right which the riparian owner might otherwise have, to object to an appropriation of water not already put to a beneficial use.

Both the reasoning and the result of Hough v. Porter have been unqualifiedly adopted by the Supreme Court of South Dakota in Cook v. Evans, 45 S. D. 31, 185 N. W. 262 (1921), and Haaser v. Englebrecht, 45 S. D. 143, 186 N. W. 572 (1922); and the grounds of the decision were termed "plausible" in Boquillas Land & Cattle Co. v. Curtis, 213 U. S. 339, 344, 29 S. Ct. 493, 53 L. Ed. 822 (1909), a case from the Supreme Court of Arizona (11 Ariz. 128, 89 P. 504) in which the question was raised but not decided.

In Washington and in California, however, a narrower interpretation of the Desert Land Act has been adopted. In Still v. Palouse Irr. & Power Co., 64 Wash. 606, 117 P. 466 (1911), lower riparian owners successfully objected to an upper riparian owner so impounding the water as materially to alter the natural flow of the stream by and through the plaintiffs' land. The contention that the plaintiffs had no riparian right to the natural flow, as against an actual appropriation by defendant because their lands were acquired from the government after the act of 1877, was denied on the grounds that the plaintiffs' lands were not acquired under, even though after, that act and that no valid and existing appropriation of water had been made by defendant or its predecessors prior to the vesting of plaintiffs' riparian rights. See, too, Bernot v. Morrison, 81 Wash. 538, 559, 143 P. 104, 111, Ann. Cas. 1916D, 290 (1914). In San Joaquin & Kings River Canal & Irr. Co. v. Worswick, 187 Cal. 674, 203 P. 999 (1922), the plaintiffs contended that their rights of appropriation were superior to the defendants' right as upper riparian owners to use the waters of the stream, because the defendants' lands were acquired from the government after 1877. In disposing of this contention the California court said: "It is obvious from the framework and language of the act of 1877 that it was not intended to apply to all the public lands of the United States. Its main purpose was to provide for the sale of desert lands which could be reclaimed by bringing water thereon. It may be true that as to such lands the purpose was to divert the riparian rights in the waters existing thereon and devote the same to the public uses stated. We do not think that question is involved in the present

case, and we need not express any opinion on it. There is nothing in the act which justifies giving that particular part thereof so wide an application as to embrace all lands of the United States, wherever situated. The plaintiffs do not claim that any of the land belonging to the defendants was purchased or acquired under the Desert Land Act, and there is no finding that in fact such lands were desert lands. * * * It follows from what we have said that the rights of the plaintiffs under their appropriations are not affected by the provisions of the Desert Land Act." 187 Cal. at page 690, 203 P. at page 1006.

In these decisions, Washington and California do not limit the right of appropriation to desert lands, recognizing that appropriations of water running through any public lands, whether desert lands or not, may be entitled to priority over subsequently acquired riparian rights. The California and Washington rule does, however, limit the application of the reservation provision of the act to lands acquired thereunder, in so far as, if at all, the effect of the act is permanently to subordinate to the right of appropriation the riparian rights in lands then owned and subsequently granted by the government.

The legislative history of the Desert Land Act as found in Cong. Rec. 44th Cong. 2d Session, vol. 5, pt. 3, pp. 1961, 1964–1974, 2225, comports better with the narrow interpretation accorded it by Washington and California than with the broad interpretation of Hough v. Porter. By the act of 1866, Congress had already provided that rights to the use of water upon public lands, acquired by appropriation and recognized by "the local customs, laws, and the decisions of courts," should be maintained and protected. R. S., § 2339, 43 U. S. C., § 661 (43 USCA § 661). By the act of 1870, it was further provided that all patents granted or pre-emption or homesteads allowed should be subject to any vested and accrued water rights acquired under or recognized by the act of 1866, R. S. § 2340, 43 U. S. C. § 661 (43 USCA § 661). Of this legislation, a distinguished writer says:

"The act of 1866 gave the formal sanction of the United States to the prevailing theory of a grant to the holders of existing rights upon public land, which indeed was its primary object; for the statute had in view chiefly appropriations already made rather than future ones, and the protection of existing rights on public land against the United

States itself (by the act of 1866) and against its later riparian patentees (by the enactment of 1870 was the primary object. * * *

"It further provided the same method for acquiring water rights on public land in the future; a vindication of the existing system for the future as well as for the past; * * *

"But as we proceed we must remember that it was wholly public land law, involving solely rights in the unoccupied public domain. * * *" 1 Wiel, Water Rights in the Western States (3d Ed. 1911) 116.

The Desert Land Act, as originally reported to the Senate by the Committee on Public Lands, did not contain the provision limiting the right to the use of water by one acquiring under the act, to the amount needed for reclamation and reserving all surplus water and other waters on the public domain to the use of the public. Indeed, the committee expressed the belief that no further legislation was necessary to regulate the use of water for purposes of irrigation. The provision now in question originated as an amendment offered on the floor of the Senate for the avowed purpose of preventing one who should acquire his lands under the act, from securing a monopoly over more water than was reasonably required for his own tract; it was modified in the course of debate to avoid the suggested possibility of conflicting with the act of 1866. Nevertheless, the act of 1877, literally interpreted, goes further than the previous legislation, in that it reserves to the public the right of appropriating water on all public lands regardless of whether or not such a right is recognized by "local customs, laws, and the decisions of courts." But neither the language nor the history of the act, fairly interpreted, supports the holding in Hough v. Porter that appropriations made after the government had parted with its title to the land outrank the riparian rights which state law would otherwise attach to government grants other than those under the Desert Land Act itself.

Furthermore, the interpretation of the Desert Land Act in Hough v. Porter is inconsistent with the general doctrine that each state "may determine for itself whether the common-law rule in respect to riparian rights or that doctrine which obtains in the arid regions of the West of the appropriation of waters for the purposes of irrigation shall control. Congress cannot enforce either rule upon any state." State of Kansas v. Colorado, 206 U. S. 46, 94, 27 S. Ct. 655, 666, 51 L. Ed. 956 (1907). See, too, United States v. Rio Grande Dam & Irr. Co., 174 U. S. 690, 702, 19 S. Ct. 770, 43 L. Ed. 1136 (1899); United States v. Central Stockholders' Corp. of Vallejo, 52 F.(2d) 322, 329 (C. C. A. 9, 1931); 2 Kinney, Water Rights (2d Ed. 1902), § 817.

Whether or not the riparian rights of owners of land acquired from the government under the Desert Land Act itself are affected by the act we need not consider, since there is no suggestion that plaintiff's lands were so acquired. We conclude that the Desert Act of 1877 did not require the state of Oregon to abandon the rule of "continuous flow" as to all riparian lands in that state settled on and patented after its enactment.

Whether Hough v. Porter should be deemed an authoritative determination of Oregon law as to the relative rights of appropriators and riparian owners of such lands, notwithstanding what we deem to be the erroneous reasons on which alone it is based, and, if so, whether it should be followed in the federal courts although involving a change of the common law in force in 1885, the date of the government patent, by court decision rendered in 1909, we need not decide, if the Hood River Case and the Water Code of 1909 can withstand plaintiff's attacks on constitutional grounds.

■ 4. We proceed then to a consideration of plaintiff's principal contention, that the riparian right to the continuous flow of the stream is a property right which became vested in its predecessors and was passed on to it, and that to deprive it thereof either by legislation or by judicial decision would violate its federal constitutional rights. Clearly riparian rights are substantial property rights which may not be arbitrarily destroyed; they may be taken, for example, under the laws of Oregon and of other states in eminent domain proceedings. Or. Laws 1891, p. 52, § 8; Umatilla Irrigation Co. v. Barnhart, 22 Or. 389, 30 P. 37 (1892); Mansfield v. Balliett, 65 Ohio St. 451, 63 N. E. 86, 58 L. R. A. 628 (1902); St. Helena Water Co. v. Forbes, 62 Cal. 182, 45 Am. Rep. 659 (1882). Like other property, however, riparian rights are subject to the police power of the state and within reasonable limits may be modified by legislation passed in the interest of the general welfare.

In several western states where the common-law rule of riparian rights was first adopted and then wholly or partly abandoned for the doctrine of appropriation, the question of the extent to which existing riparian rights may be and are thereby affected has been considered. In Clark v. Cambridge &

A. Irr. & Imp. Co., 45 Neb. 798, 64 N. W. 239 (1895), the plaintiff, a lower riparian owner, sought to enjoin interference with his use of the stream for power purposes by the defendant which claimed a right of appropriation under the Irrigation Act of 1889. This act provided: "The right to the use of running water flowing in a river, * * * may be acquired by appropriation by any person * * * provided that in all streams not more than twenty feet in width, the rights of riparian proprietors are not affected by the provisions of this act." Although the stream in question exceeded twenty feet in width the statute was held to be ineffective to impair the plaintiff's riparian rights, because, "assuming such to have been the intention of the legislature, it is a clear invasion of private rights, and within the prohibition of the constitution." In Crawford Co. v. Hathaway, 67 Neb. 325, 343, 93 N. W. 781, 787, 60 L. R. A. 889, 108 Am. St. Rep. 647 (1903), other irrigation statutes of the state were construed to authorize the condemnation of riparian water rights but not otherwise to impair them, because "the rights of riparian proprietors to the use of the waters flowing in the streams to which their lands are adjacent, when once attached, is * * * a vested right of property, * * * which the owners cannot rightfully be deprived of or divested except by grant, prescription, or condemnation, with compensation by some of the means and methods recognized by law for the taking or damaging of private property for public use." A similar construction was applied on like grounds to the Kansas statutes, permitting water to be appropriated for purposes of irrigation, in Clark v. Allaman, 71 Kan. 206, 80 P. 571, 70 L. R. A. 971 (1905), and to Texas appropriation statutes in McGhee Irrigation Ditch Co. v. Hudson, 85 Tex. 587, 591, 22 S. W. 398, 967 (1893). See, too, Barrett v. Metcalf, 12 Tex. Civ. App. 247, 33 S. W. 758 (1896).

In St. Germain Irrigating Ditch Co. v. Hawthorne Ditch Co., 32 S. D. 260, 143 N. W. 124, 127 (1913), in a suit by one claiming as an appropriator under the statute against several defendants, some of whom claimed the right to use the water of the stream as riparian owners, it was held that a statute requiring any one seeking to make a beneficial use of water, to secure a permit from the state engineer, was invalid as to riparian proprietors, because it conflicted with the state constitutional provisions protecting private property. The court said: "The right of a riparian owner to make a reasonable beneficial use of the waters of a flowing stream for domestic and irrigation purposes is a vested property right and is entitled to protection to the same extent as property rights generally."

It should be noted that the riparian right of which the court is speaking in this case is the affirmative right to use the water for certain purposes, not the right to prevent others from diverting it.

In Nielson v. Sponer, 46 Wash. 14, 89 P. 155, 123 Am. St. Rep. 910 (1907), a statute (Ballinger's Ann. Codes & St. Wash. § 4114) providing that "the person upon whose lands the seepage or spring waters first rise shall have a prior right to such waters, if capable of being used upon his lands," did not justify an upper riparian owner upon whose lands a stream so originated, in using up the water for irrigation so as to prevent its use for ordinary domestic purposes by lower riparian owners whose lands had been patented before the statute.

In Boquillas Land & Cattle Co. v. St. David Co-op-Commercial & Development Ass'n, 11 Ariz. 128, 89 P. 504, 507 (1907), the plaintiff, relying upon its common-law riparian rights, sought to enjoin the defendants from entering upon its land for the purpose of reconstructing a dam and diverting water in accordance with an appropriation made before the plaintiff had made any use of the water of the stream. The First Legislature of the Territory of Arizona had provided, in 1864, that "the common law of England so far as it is not repugnant to or inconsistent with the Constitution and laws of the United States or the Bill of Rights or the laws of this territory is hereby adopted and shall be the rule of decision in the courts of this territory." The Bill of Rights, however, provided: "All streams, lakes, and ponds of water capable of being used for the purpose of navigation or irrigation are hereby declared to be public property * * *." In 1887, the Legislature enacted that "the common law doctrine of riparian water rights shall not obtain or be of any force or effect in this territory." The Supreme Court of Arizona denied plaintiff's claim of riparian right on the alternative grounds that the common-law doctrine of riparian rights had never applied in the territory of Arizona, and that "where the Legislature has, subject to future legislation, conferred riparian rights to the use of water from flowing streams upon riparian owners, the latter cannot be said to be vested in such a sense as that they may not be subsequently abrogated by statute, at

any rate when the riparian owner has made no use of the water permitted him at common law." The Supreme Court, 213 U. S. 339, 29 S. Ct. 493, 53 L. Ed. 822 (1909), in affirming the state court, rested the decision entirely on the first ground and did not consider the contention that the act of 1887, as interpreted by the Arizona court, deprived the plaintiff of property without due process of law.

When states which recognize the doctrine of prior appropriation adopt a system for the administrative determination of water rights, the question has been raised whether or not the new system applies to water rights theretofore acquired. In Farm Investment Co. v. Carpenter, 9 Wyo. 110, 61 P. 258, 266, 50 L. R. A. 747, 87 Am. St. Rep. 918 (1900), the contention that the declaration in the Constitution of Wyoming that all natural waters were the property of the state and the provisions of the Water Act of 1890 establishing a Board of Control for the adjudication of water rights, could not validly be so applied, was overruled; the court said: "Where various rights are connected with the same stream or body of water, a subsequent claim cannot be successfully regulated without including in the regulations all rights. The water to which the use of each attaches is public, and the people as a whole are intensely interested in its economical, orderly, and inexpensive distribution." See, too, Ormsby County v. Kearney, 37 Nev. 314, 142 P. 803 (1914); Humboldt Land & Cattle Co. v. Allen, 14 F.(2d) 650, 654 (D. C. Nev., 1926) affirmed 274 U. S. 711, 47 S. Ct. 574, 71 L. Ed. 1314 (1927).

Despite the emphasis in some state decisions on the necessity of preserving riparian rights from impairment by judicial or legislative action, it cannot be doubted that in the course of the development of western water law, previously recognized riparian rights have been subjected to various modifications by legislative and by judicial action. After holding in Vansickle v. Haines, 7 Nev. 249 (1872), that the legislative adoption of the common law included the common-law doctrine of riparian rights, the court overruled this decision, and in Jones v. Adams, 19 Nev. 78, 6 P. 442, 3 Am. St. Rep. 788 (1885), adopted the rule of prior appropriation.

See, too, Reno Smelting, Milling & Reduction Works v. Stevenson, 20 Nev. 269, 21 P. 317, 4 L. R. A. 60, 19 Am. St. Rep. 364 (1889). In Brown v. Chase, 125 Wash. 542, 217 P. 23, 25 (1923), the court, departing from earlier general expressions in its opinions, held that a riparian owner was not entitled, as against an appropriator, to the undiminished flow of the stream if that flow was not of substantial benefit to him; it said: " * * * while this court has recognized the common-law riparian rights, it has also modified and enlarged that doctrine by ingrafting upon it the necessity of beneficial use by the riparian owner, refusing relief where the riparian owner was not substantially damaged, and granting relief where he was either presently or prospectively so damaged."

And in Proctor v. Sim, 134 Wash. 606, 236 P. 114, 117 (1925), the same court said: "For years past the trend of our decisions and the tenor of our legislation have been to restrict and narrow the common law of riparian rights. * * *" In harmony with that development, the provision of the 1917 Water Code of that state, saving "the existing rights of any riparian owner," was construed to protect only "the right to the beneficial use of such portions of the waters of the lake as are either directly or prospectively, within a reasonable time, proper and necessary for the irrigation of their lands and for the usual domestic purposes." For other instances of judicial modification of riparian rights, see the opinion of Judge Coshow in the Hood River Case, 114 Or. at page 193, 227 P. at page 1091.

In California, it has often been emphasized that riparian rights are substantial property rights which cannot arbitrarily be impaired or destroyed. It is recognized, however, that like other property rights, they are subject to the police power of the state and may be modified within reasonable limits when the general welfare requires.[2]

In Herminghaus v. Southern California Edison Co., 200 Cal. 81, 252 P. 607 (1926), the court sustained the right of plaintiffs, lower riparian owners, to prevent defendants, upper riparian owners, from impounding the waters of the stream so as to deprive the plaintiffs of the benefits of annually recur-

---

[2] For valuable discussions of present problems of California water law, see Bingham, Some Suggestions Concerning the California Law of Riparian Rights (1934) 22 Cal. L. Rev. 251, and Comment (1934) 22 Cal. L. Rev. 333. For earlier discussions, see Wiel, Pending Water Amendment to California Constitution and Possible Legislation (1928) 16 Cal. L. Rev. 170, 257; Treadwell, Modernizing the Water Law (1928) 17 Cal. L. Rev. 1.

ring floods and freshets. In conformity with Palmer v. Railroad Commission, 167 Cal. 163, 138 P. 997 (1914), and San Bernardino v. Riverside, 186 Cal. 7, 198 P. 784 (1921), the court held that the defendant's right of appropriation under the Civil Code, §§ 1410–1422, was subordinate to prior vested riparian rights in the natural flow of the stream. The defendant also contended that the plaintiffs' riparian rights were limited by sections 11 and 42 of the Water Commission Act of 1913 (St. 1913, pp. 1017, 1033) which declared that all waters not applied to a "useful and beneficial purpose" or reasonably needed for such purposes were subject to appropriation in accordance with the provisions of the act, and that the term "useful or beneficial purposes" should not "be construed to mean the use in any one year of more than two and one half acre feet of water per acre in the irrigation of uncultivated areas of land. * * * " The court held section 11 inapplicable because the flood waters were beneficial to the plaintiffs and held the limitation in section 42 to two and one-half acre feet invalid on the ground that to allow the Legislature to determine the extent to which riparian owners could claim the beneficial use of water "would be to concede to the legislative department of the state government the arbitrary power to destroy vested rights in private property of every kind and character." To this holding, however, the court added the qualifications: " * * * If the state were here essaying to uphold an effort on its part to work out impartially, unselfishly and in the interests of the whole people some general plan or system for the equitable adjustment of rights and uses in its flowing streams with a view to the conservation, development, and distribution of the dynamic forces and generative and fertilizing fructibilities of their waters, it might well be argued that public policy, public interest, and a most liberal interpretation of the police powers of the state might rightfully be invoked in support of such an effort." 200 Cal. at page 120, 252 P. at page 623. Justice Shenk dissented on the ground that sections 11 and 42 constituted valid regulations in the interest of the conservation of the waters of the state, and that under those sections, a wasteful use of water by a riparian owner could not prevent a reasonable use by an appropriator.

In Fall River Valley Irr. Dist. v. Mt. Shasta Power Corp., 202 Cal. 56, 259 P. 444, 449, 56 A. L. R. 264 (1927), the plaintiff, seeking to establish that its right of appropriation under the act of 1913 was superior to the riparian right of the defendant who was already using the flow of the stream for power purposes, contended that the act of 1913 was an exercise of the police power of the state which justified such a subordination of riparian rights. As to this, the court said: "We need here only say that the legislative department of the state may not take any portion of a vested property right from one person and invest another with it and be justified in so doing in view of the provisions of sections 13 and 14 of article 1 of the State Constitution and the Fourteenth Amendment to the Constitution of the United States."

But again the court added the qualification: "We are by no means intending to say that riparian rights may not under proper circumstances yield to the police power in the interest of public health, safety, comfort, or welfare, but the Act of June 16, 1913, does not purport to be an exercise of such power for any purpose nor do the facts in the present case give rise to a situation where the police power may operate." 202 Cal. at page 67, 68, 259 P. at page 449.

Justice Shenk concurred in the decision, on the ground that the waters of the river had already been applied to a beneficial use by defendant and others before the application of plaintiff's predecessor in interest, but dissented from the court's assumption that the Water Commission Act of 1913 had not, as an exercise of the police power, effected a modification of riparian rights.

Finally, in Gin S. Chow v. City of Santa Barbara, 217 Cal. 673, 22 P.(2d) 5 (1933), the plaintiffs, riparian owners, sought to prevent defendants from impounding and diverting, under their claimed right of appropriation, water from the water shed of the Santa Ynez river above plaintiff's lands. The decision of the lower court denying the relief prayed, was affirmed primarily on the ground that the defendants disclaimed any intention of impounding the ordinary flow of the river, but limited themselves and were also limited by the decree to the right of impounding storm waters in excess of the ordinary and usual flow. Plaintiff, however, also urged that as against a non-riparian appropriator, a riparian owner was entitled to insist upon the undiminished flow of the stream, no matter how slight both the benefit of such flow and the damage of the threatened diversion might be. The court, conceding that this was a fair statement of the effect of the previous California decisions, held that this rule had been modified by a constitution-

al amendment,[3] adopted in 1928, after the Herminghaus and Fall River Cases, and that, in consequence, the rule of reasonable use now applied as between riparian owner and nonriparian appropriator. To the contention that the amendment so interpreted was a violation of the state and federal constitutional guaranties against deprivation of property without compensation, the court answered:

"It was because this court felt impelled to adhere to the long-established rule of Lux v. Haggin [69 Cal. 255, 4 P. 919, 10 P. 674], that a constitutional amendment was made necessary. * * *

"There is a well recognized and established distinction between a 'taking' or 'damaging' for public use and the regulation of the use and enjoyment of a property right for the public benefit. The former falls within the realm of eminent domain, and the latter within the sphere of the police power. That the constitutional amendment now under consideration is a legitimate exercise of the police power of the state cannot be questioned. It is the highest and most solemn expression of the people of the state in behalf of the general welfare. The present and future well-being and prosperity of the state depend upon the conservation of its life-giving waters. * *. *

" The conservation of other natural resources are of importance, but the conservation of the waters of the state is of transcendent importance. Its waters are the very life blood of its existence. The police power is an attribute of sovereignty and is founded on the duty of the state to protect its citizens and provide for the safety, good order, and well-being of society. It is coextensive with the right of self-preservation in the individual. * * *

"In its inception the police power was closely concerned with the preservation of the public peace, safety, morals, and health, without specific regard to the general welfare. Under modern conditions it includes the general welfare which embraces regulations 'to promote the economic welfare, public convenience, and general prosperity of the community.' Chicago, B. & Q. R. Co. v. Illinois, 200 U. S. 561, 592, 26 S. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175. * * *

"As already observed the amendment purports only to regulate the use and enjoyment of a property right for the public benefit, for which reason the vested right theory cannot stand in the way of the operation of the amendment as a police measure. A vested right cannot be asserted against it because of conditions once obtaining. * * *

"There is nothing novel about the limitation of the riparian right to a reasonable, beneficial use of water. Other western states which first adopted the common-law doctrine of riparian rights have effectually changed it to meet modern conditions. * * *.

"Oregon in 1909 checked the extension of the old common-law doctrine of riparian rights, recognizing, however, certain rights secured prior to 1877. Hough v. Porter, 51 Or. 318, 95 P. 732, 98 P. 1083, 102 P. 728. Thereafter the Legislature adopted a water code limiting the riparian owner to a reasonable beneficial use. The code was upheld. In re Willow Creek, 74 Or. 592, 144 P. 505, 146 P. 475. Its constitutionality was again affirmed in Re Water Rights of Hood River, 114 Or. 112, 227 P. 1065." 217 Cal. at 700–704, 22 P.(2d) at 16, 17.

---

3 Cal. Const. art. 14, § 3: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

It has long been generally recognized that the establishment of an administrative system for the regulation and determination of water rights, such as that adopted by Oregon Water Code of 1909, is a legitimate exercise of the police power of the state. 2 Wiel, Water Rights in Western States (3d Ed. 1911) § 1184, p. 1097; Freund, Police Power (1904) §§ 414–417. The intensity of the public interest involved is indicated by the provisions in the constitutions and statutes of western states declaring the waters of natural streams and lakes to be the property of the public or of the state. Colo. Const. art. 16, § 5; Wyo. Const. art. 8, § 1; Utah Rev. St. 1933, 100-1-1, Nev. Comp. Laws 1929, § 7890; Neb. Comp. St. 1929, § 46-502; Or. Code 1930, § 47-401. See Lasky, From Prior Appropriation to Economic Distribution of Water by the State —Via Irrigation Administration (1929) 1 Rocky Mt. L. Rev. 161, 174-187. The Oregon Water Code of 1909 itself purported to be an exercise of the police power of the state as shown by section 74 (Laws Or. 1909, p. 343):

"*Emergency.*—Whereas, there is great uncertainty existing throughout the State with reference to the water rights of various parties along the streams, ditches and waterways as to their several interests therein, entailing expensive litigation and engendering many animosities and much bad blood, thereby endangering the public peace and safety of many sections of the State, and Whereas, it is urgent that these conditions be remedied for the preservation of the public peace, health and safety of the State, this act shall be in full force and effect from and after its approval by the Governor."

For a similar emphasis upon the peace of the community as one of the purposes to be achieved by water regulation, see White v. Farmers' High Line Canal & Reservoir Co., 22 Colo. 191, 197, 43 P. 1028, 1030, 31 L. R. A. 828 (1896).

 The question is whether or not the modification of riparian rights effected by the statute of 1909, as construed by the court in the Hood River Case, could reasonably be regarded as essential to the accomplishment of the ends sought to be achieved by such legislation. That those ends may properly include the economic welfare of the community, as well as its peace, health, and safety is, of course, well established. Home Building & Loan Ass'n, v. Blaisdell, 290 U. S. 398, 436, 437, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481 (1934). It cannot be doubted that the economic welfare of the people of Oregon

was one of the principal aims sought to be promoted by the Water Code of 1909. Some of the most fully developed parts of the state, notably the Hood River Valley east of the Cascade Mountains, the Rogue River Valley, and the valley of the Umpqua river are said to owe their development as fruit raising districts entirely to irrigation. See page 58 of Brief on Merits filed by the Attorney General of Oregon in the Supreme Court in Columbia-Deschutes Power Co. v. Stricklin, supra. We have the emphatic word of the majority of the Oregon court that modification of riparian rights was necessary to the effectuation of that purpose and that the preservation of such a right as plaintiff is claiming would "take the heart out of the Water Code." This judgment of the state court, familiar as it is with the local conditions that called forth this legislation, is in itself entitled to great respect as evidence of the reasonableness and necessity of such interference with private rights. See Welch v. Swasey, 214 U. S. 91, 105, 106, 29 S. Ct. 567, 53 L. Ed. 923 (1909); Laurel Hill Cemetery v. San Francisco, 216 U. S. 358, 365, 30 S. Ct. 301, 54 L. Ed. 515 (1910). It also serves to distinguish the present case from cases hereinabove cited, in which the state court either construed the statute as inapplicable to riparian rights theretofore acquired, or held it unconstitutional as so applied. In those states, the need for a complete change in the water law may have been deemed less exigent.

 Under the common law, the right of the riparian owner is to the usufruct of the water and not to the water itself. Legislation limiting the right to its use is in itself no more objectionable than legislation forbidding the use of real property for certain purposes. Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016 (1926); Gorieb v. Fox, 274 U. S. 603, 47 S. Ct. 675, 71 L. Ed. 1228, 53 A. L. R. 1210 (1927). See, too, Marblehead Land Co. v. City of Los Angeles, 47 F.(2d) 528 (C. C. A. 9, 1931). To argue, as plaintiff does, that riparian rights are real property rights which attach to the land, does not put such rights beyond the reach of the police power. Chicago & Alton R. R. v. Tranbarger, 238 U. S. 67, 35 S. Ct. 678, 59 L. Ed. 1204 (1915). See Block v. Hirsch, 256 U. S. 135, 155, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165 (1921). This is not a case where a right of action had accrued on the basis of the previous law before it was superseded by the legislation under attack. Cf.

Ettor v. Tacoma, 228 U. S. 148, 33 S. Ct. 428, 57 L. Ed. 773 (1913); Forbes Pioneer Boat Line v. Board of Comm'rs, 258 U. S. 338, 42 S. Ct. 325, 66 L. Ed. 647 (1922). That the common-law rights to the relative use of certain natural resources may be modified in the interest of securing fairer distribution thereof as well as of preventing physical or economic waste is established by Champlin Refining Co. v. Corp. Commission of Okla., 286 U. S. 210, and cases cited therein at page 234, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403 (1932). See, too, F. C. Henderson, Inc., v. R. R. Comm. of Tex., 56 F.(2d) 218 (D. C. W. D. Tex. 1932).

In Hudson County Water Co. v. McCarter, 209 U. S. 349, 28 S. Ct. 529, 531, 52 L. Ed. 828, 14 Ann. Cas. 560 (1908), the right of a state, in the exercise of its police power, to modify existing riparian rights has been even more explicitly established. The Attorney General of the State of New Jersey filed an information in the state court to enjoin the defendant from carrying waters of the Passaic river out of the state, contrary to a prohibitory statute. Defendant contended that the statute violated its right as a riparian owner to divert whatever water it desired from the stream in as much as there were no objecting riparian interests below. The New Jersey court sustained an injunction on the ground that the common law recognized no such riparian right and that the state of New Jersey itself had a proprietary interest in the stream giving it the right to object to the diversion. McCarter v. Hudson County Water Co., 70 N. J. Eq. 695, 65 A. 489, 14 L. R. A. (N. S.) 197, 118 Am. St. Rep. 754, 10 Ann. Cas. 116. Expressly disclaiming any intention of casting doubt upon the ground of the state court's decision, the Supreme Court stated that it preferred to rest its affirmance upon the broader ground of the police power of the state. Mr. Justice Holmes said:

"All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. The limits set to property by other public interests present themselves as a branch of what is called the police power of the state. The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the

nearer or farther side. For instance, the police power may limit the height of buildings in a city, without compensation. To that extent it cuts down what otherwise would be the rights of property. But if it should attempt to limit the height so far as to make an ordinary building lot wholly useless, the rights of property would prevail over the other public interest, and the police power would fail. To set such a limit would need compensation and the power of eminent domain.

"* * * But it is recognized that the state, as quasi-sovereign and representative of the interests of the public, has a standing in court to protect the atmosphere, the water, and the forests within its territory, irrespective of the assent or dissent of the private owners of the land most immediately concerned. * * *

"The problems of irrigation have no place here. Leaving them on one side, it appears to us that few public interests are more obvious, indisputable, and independent of particular theory than the interest of the public of a state to maintain the rivers that are wholly within it substantially undiminished, except by such drafts upon them as the guardian of the public welfare may permit for the purpose of turning them to a more perfect use. This public interest is omnipresent wherever there is a state, and grows more pressing as population grows. It is fundamental, and we are of opinion that the private property of riparian proprietors cannot be supposed to have deeper roots. Whether it be said that such an interest justifies the cutting down by statute, without compensation, in the exercise of the police power, of what otherwise would be private rights of property, or that, apart from statute, those rights do not go to the height of what the defendant seeks to do, the result is the same."

The modification of riparian rights which the act of 1909 has effectuated is not so drastic a change as to amount to taking of property without due process of law. See Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321 (1922). At common law, the usufruct of the riparian owner was not absolute; it was conditioned on the equal right of every other riparian owner to the use of the water. By the Oregon legislation, his usufructuary privileges were not destroyed; his right of access to and to the equal use of the waters for ordinary domestic purposes were preserved. Re Water Rights of Hood River, 114 Or. at 190, 227 P. at 1089. This legislation, however, has changed the conditions under

which the riparian owner's privilege otherwise to use the water may be exercised. On the one hand, his unrestricted right reasonably to use his fair share of the waters for beneficial purposes is now subordinated to a prior appropriation for beneficial purposes. On the other hand, he is no longer limited in such beneficial use to his fair proportion of the waters over and above those needed for domestic purposes by all riparian owners; and as a riparian owner, he is in a peculiarly advantageous position to exercise the right of appropriation. The statute cannot be said to take away property from one in order to give it to another, even though the effect of the operation of the statute in a specific case may be so to transfer the privilege of making some specific use of the water.

We conclude, then, that the riparian owner's right to the natural flow of the stream substantially undiminished has been validly abrogated by the Water Code of 1909 as construed by the Oregon court. Plaintiff's assertion of such a right in this case cannot, therefore, be sustained.

5. The record does not justify us in differing with the district judge who deemed that the injunction as granted would suffice to preserve plaintiff's access to the water and its enjoyment of "the residual rights guaranteed by the modified riparian right doctrine." Plaintiff asserts that the chief value of its lands, due to their location, lies in their availability for power purposes, and that they cannot be so utilized if defendant be permitted to consummate its alleged wrongful acts. Any loss of this value would, however, be damnum absque injuria; it would be due to defendants' forehandedness in obtaining the certificates and permits that give them priority in putting the waters of the river to a beneficial use.

It is not clearly apparent whether plaintiff claims that removal of the rock blasted and to be blasted either of itself or combined with the maximum operation of the plant will cause such a diversion as substantially and permanently to move the thread of the stream toward defendant's land or will cause only an intermittent change dependent upon defendant's actual operations of its proposed plant and the stage of the river. In either case, however, plaintiff has no legal cause for complaint or for further injunctive relief, even though, if such change were permanent, it would alter the relation of plaintiff's western boundary line to the thread of the river. While with a gradual change, the thread of the river continues to be the boundary line between opposite riparian owners, with a sudden and apparently permanent change, the boundary remains as theretofore, that is, at the line of the thread of the former main channel and not at the thread of the new channel. Wyckoff v. Mayfield, 130 Or. 687, 280 P. 340 (1929). The riparian owner has no legal right in Oregon to the continuance of the thread of the stream as his boundary.

Defendants' proposed diversion of the water, pursuant to the certificates and permits of appropriation for beneficial purposes and the blasting on and removal of the rock from their own part of the river bed in the accomplishment of this purpose, will violate none of plaintiff's rights, provided defendants maintain the water level prescribed in the injunction as granted. If plaintiff's fears that defendants, in the operation of the power plant, will violate the injunction to its damage, should be realized, the remedy that will give plaintiff full protection is readily available. Such fears justify neither a reversal nor a modification of the decree.

Decree affirmed.

WILBUR, Circuit Judge (dissenting in part).

I concur in that portion of the main opinion which construes the Desert Land Act of March 3, 1877 (19 Stat. 377 [43 USCA § 321]).

The main opinion relies largely on the Hood River Case, 114 Or. 112, 227 P. 1065, adjudicating the rights of claimants to water in the Hood river of Oregon. This case dealt with the power rights of the Pacific Power & Light Company. The court held that the Pacific Power & Light Company, although the owner of riparian land on both banks of the Hood river, was not entitled to the undiminished flow of the river through their land under the law of Oregon, and that the common-law doctrine of riparian rights was to that extent inapplicable to the conditions in Oregon. The court also held that the Pacific Power & Light Company had no right to power by reason of its riparian ownership because it had not used the power prior to the enactment of the Water Code of 1909. As the decision in the main opinion is based very largely upon the decision of the Supreme Court of Oregon in the Hood River Case, I proceed to state the reasons why I agree with the first conclusion of the Supreme Court of Oregon, and of the majority of the court in the case at bar, in holding that the right of the riparian owner to an undiminished flow of water through his land in order that he

might use the same for the development of power, is subordinate to the right of those who have appropriated water for irrigation purposes above the land in question. I will follow this discussion by a statement of the reasons why I disagree with the conclusion of the majority in the case at bar holding that the riparian right of the appellant is subordinate to the claim of appropriation of water for power purposes made subsequent to the grant of appellant's riparian right to use the water for power purposes.

As pointed out by the Supreme Court of Oregon in the Hood River Case, to hold that the common-law doctrine of the right of riparian owners to the full and undiminished flow of the stream is applicable would prevent the use of water for irrigation because any use of water for irrigation necessarily diminishes the flow of the stream below the point of diversion. As pointed out by Judge Bean, the author of the majority opinion in the Hood River Case: "The very essence of the common law is flexibility and adaptability. It does not consist of fixed rules, but is the best product of human reason applied to the premises of the ordinary and extraordinary conditions of life, as from time to time they are brought before the courts. Although the common law is homogeneous, yet it finds widely different expression in different jurisdictions. If the common law should become so crystallized that its expression must take on the same form wherever the common-law system prevails, irrespective of physical, social, or other conditions peculiar to the locality, it would cease to be the common law of history, and would be an inelastic and arbitrary code. It is one of the established principles of the common law, which has been carried along with its growth, that precedents must yield to the reason of different or modified conditions."

A good illustration of this rule of adaptation is in the Town of Antioch v. Williams Irr. Dist., 188 Cal. 451, 462, 465, 205 P. 688, 693, where Chief Justice Shaw, speaking for the court, said: "In this state the climate, the original ownership of the land, the policy of the governments of the United States and the state, the original owners, regarding the use and occupancy thereof for mining purposes by persons not in privity with them, and the necessity of water for placer mining and irrigation, are all so different from the conditions existing in Great Britain, where the common law had its origin, that the court from the first has had some difficulty in applying it here without producing the injustice or wrong which it is the chief purpose of the common law to prevent or redress. It has frequently been necessary to invoke the maxim of jurisprudence that 'when the reason of a rule ceases, so should the rule itself,' and this maxim has been incorporated into the Civil Code. Section 3510. It is as much a part of the common law as are the rules concerning the right of appropriation of water." Page 465 of 188 Cal., 205 P. 688, 694: "Similar unprecedented conditions were presented in Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35, and the numerous cases following it. It was there said that: 'Whenever it is found that, owing to the physical features and character of this state, and the peculiarities of its climate, soil, and productions, the application of a given common-law rule by our courts tends constantly to cause injustice and wrong, rather than the administration of justice and right, then the fundamental principles of right and justice on which the law is founded, and which its administration is intended to promote, require that a different rule should be adopted.'"

If a court can apply the rule of reason in defining the rights of a riparian owner, and declare that changed conditions demand a change in the rights of a riparian owner, it would seem to follow that the legislative branch of the government could also declare and define the rights of a riparian owner so long, and, I think, only so long as the legislation is a reasonable adaptation of the common-law rule to the conditions obtaining in the state, assuming of course that the state has followed the common law in defining the rights of riparian owners. In Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 567 (38 L. Ed. 331, 350, see, also, Rose's U. S. Notes), Justice Gray, speaking for the court, said: "The settlers of Oregon, like the colonists of the Atlantic states, coming from a country in which the common law prevailed, to one that had no organized government, took with them, as their birthright, the principles of the common law, so far as suited to their condition in their new home. The jurisprudence of Oregon, therefore, is based on the common law." See, also, Lytle v. Hulen, 128 Or. 483, 510, 275 P. 45.

The common-law doctrine of riparian rights was fully and completely adopted by legislation (Territorial Act June 7, 1844, Laws Or. 1843–49, p. 100), and by its Constitution, article 18, § 7, and by judicial decisions of the state of Oregon, as will appear by the following quotation from the decisions

of the Supreme Court of Oregon and from our own decisions. In United States F. & G. Co. v. Bramwell, 108 Or. 261, 217 P. 332, 333, 32 A. L. R. 829, the Supreme Court of Oregon said: "The common law of England, modified and amended by English statutes, as it existed at the time of the American Revolution, as far as it was general and not local in its nature and applicable to the conditions of the people and not incompatible with the nature of our political institutions or in conflict with the Constitution and laws of the United States or of this state, except as modified, changed, or repealed by our own statutes, has been adopted and is in force in this state. Peery v. Fletcher, 93 Or. 43, 182 P. 143."

In Eastern Oregon Land Co. v. Willow River Land & Irrig. Co., 201 F. 203, 213, this court said:

"It will not be necessary to enter into a discussion of the statutes and various decisions of the Supreme Court of Oregon defining riparian rights in that state. We will accept the opinion of the learned District Judge in this case upon that question that:

" 'The riparian proprietor is entitled to the ordinary and usual flow of a stream as long as it is of any beneficial use to him, and this may, under some circumstances, include flood or overflow waters reasonably to be anticipated during ordinary seasons.' "

The decision referred to is that of Judge Bean of the District Court of the United States for the District of Oregon, Eastern Oregon Land Co. v. Willow River Land & Irrig. Co., 187 F. 466, 468, and is as follows: "The general doctrine of riparian rights is too firmly established in this state to be shaken now by judicial decision. It is useless to cite authorities. The riparian proprietor is entitled to the ordinary and usual flow of a stream as long as it is of any beneficial use to him. * * *"

In Harris v. Southeast Portland Lumber Co., 123 Or. 549-556, 557, 262 P. 243, 245, it is said:

"In Weiss v. Oregon Iron & Steel Co., 13 Or. 496, 11 P. 255, this court, speaking through Mr. Justice Lord, said:

" 'Riparian proprietors are entitled, in the absence of grant, license, or prescription limiting their rights, to have the stream which washes their lands flow as it is wont by nature, without material diminution or alteration. ~ ` * The general principle is that every owner of land through which a natural stream of water flows has a usufruct in the stream as it passes along, and has an equal right with those above and below him to the natural flow of the water in its accustomed channel, without unreasonable detention or substantial diminution in quantity or quality, and none can make any use of it prejudicial to the other owners, unless he has acquired a right to do so by license, grant, or prescription.' "

After making the foregoing quotation from 13 Or. 496, 11 P. 255, the opinion in the Harris Case, continues: "The rights claimed in this suit are purely riparian in their nature, and, as such, each proprietor, in the absence of grant, license, or prescription limiting his rights, may insist that the stream shall flow to his land in the usual quantity, at its natural place and height, and that it shall flow off his land to his neighbor below in its accustomed place and at its usual level, and this right is a right of property inseparably annexed to the soil itself and exists jure naturæ as parcel of the land, which right will not be suspended or destroyed by mere nonuser, although it may be extinguished by the long-continued adverse enjoyment of others. Gould on Waters (3d Ed.) § 204. The evidence of a right by prescription 'ought always to be clear and conclusive.' McRae v. Small, 48 Or. 139, 85 P. 503." This was fully recognized by a majority of the court in the Hood River Case, the majority adopting the statement of Judge McCourt in his dissent, as follows: "Comparatively early in the judicial history of the state, this court by its decisions enforced and applied the common-law doctrine of riparian rights, as defined and established by the American and English cases and by eminent text-writers. Or. Iron Co. v. Trullenger, 3 Or. 1 (1867); Taylor v. Welch, 6 Or. 198 (1876); Hayden v. Long, 8 Or. 244 (1880); Coffman v. Robbins, 8 Or. 278 (1880); Shively v. Hume, 10 Or. 76 (1881); Shook v. Colohan, 12 Or. 239, 6 P. 503 (1885); Weiss v. Or. Iron Co., 13 Or. 496, 11 P. 255 (1886)." The majority also held that the Water Code of 1909 did not unreasonably interfere with the vested riparian rights of a riparian owner to develop power by recognizing the rights of appropriators above to divert some of the water to the prejudice of the fullest exercise of the right of the lower riparian owner as recognized by the common law of England, upon the theory that a state either by judicial decision or legislation may reasonably construe or apply the doctrine of common-law riparian rights. I am willing to concede that the right of riparian owners to the use of the entire flow of a stream for power purposes in Oregon was subordinate to the

right of upper riparian owners to use water for irrigation and am inclined also to agree with the holding of the Supreme Court of Oregon in the Hood River Case that it was also subordinate to the right of the state to permit appropriation of water above the riparian land for beneficial use in irrigation. The question involved in the case at bar, however, does not involve a conflict between a riparian owner claiming power rights and upper riparian owner or appropriator claiming the right to use water for irrigation. It is a conflict between the owners of the adjoining banks of a stream to power developed by the stream in its flow along the stream bed which belongs jointly to the parties to the action. The appellee bases its right to use the water for power purposes, not upon its riparian right which obviously is no greater than that of the owner of the adjoining bank of the stream, but upon a permit issued by the state engineer giving it a right to use the water of the stream for power purposes. It is claimed that this permit gives it a right superior to the riparian owner and this would be equally true whether the appellee were a riparian or merely an appropriator recognized by the state officials. I do not believe the Legislature of the state has the power to divest the right of the appellant to the use of the water flowing across his land for power purposes and to grant that right to the owner of the opposite bank or to a third person. I will now state my reasons for this conclusion:

Where patents to government land were issued and rights thereby vested in a riparian owner to the usufruct of the water, the question of whether or not the act of the state or of private individuals acting under its authority is a taking of private property within the meaning of the Fourteenth Amendment is necessarily one to be determined by the courts and ultimately of course by the Supreme Court of the United States. The federal courts must exercise their own independent judgment in the matter, as stated by the Supreme Court in Chicot County v. Sherwood, 148 U. S. 529, 13 S. Ct. 695, 697, 37 L. Ed. 546, as follows: "In Hyde v. Stone, 20 How. [61 U. S.] 170, 175 [15 L. Ed. 874], it is said: 'But this court has repeatedly decided that the jurisdiction of the courts of the United States over controversies between citizens of different states cannot be impaired by the laws of the states, which prescribe the modes of redress in their courts, or which regulate the distribution of their judicial power. In many cases state laws form a rule of decision for the courts of the United States, and the forms of proceeding in these courts have been assimilated to those of the states, either by legislative enactment or by their own rules. But the courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction. Suydam v. Broadnax, 14 Pet. [39 U. S.] 67 [10 L. Ed. 357]; Union Bank of Tennessee v. Vaiden, 18 How. [59 U. S.] 503 [15 L. Ed. 472].' This principle has been steadily adhered to by this court."

That serious interference with riparian rights is a taking of property in violation of the Fourteenth Amendment to the Constitution is recognized and decided by the Supreme Court of Oregon in Logan v. Spaulding Logging Co., 100 Or. 731, 736, 190 P. 349, 351, where it is stated: "It will be observed that the doctrine thus announced clearly asserts that interference with the natural flow of the stream, in so far as it injures the riparian proprietor, or interferes with his enjoyment of his right to the use of the stream, is a taking pro tanto of his property, which is governed by the constitutional provision above quoted. This statement of the law has been reaffirmed by this court in Trullinger v. Howe, 53 Or. 219, 97 P. 548, 99 P. 880, 22 L. R. A. (N. S.) 545, and Flinn v. Vaughn, 55 Or. 372, 106 P. 642, and must be taken as the settled law in this state, regardless of what may have been the holding in some other jurisdiction." I will return to a consideration of that question after calling attention to the fact that in the case at bar we are presented with a most unusual situation where the controversy is not between upper appropriators, or riparian owners, and a lower riparian owner, as in the Hood River Case, but between adjoining riparian owners as to the right to use the hydraulic power due to the fall of water as it passes over their land. No one doubted in the Hood River Case that a riparian owner, owning all the riparian lands along the stream, was entitled to hydraulic power thereon due to the fall of the stream while on its property. This was assumed in the decision and is well established by the common law. The common-law rule is stated by the Supreme Court in U. S. v. Rio Grande Dam & I. Co., 174 U. S. 690, 19 S. Ct. 770, 774, 43 L. Ed. 1141: "The unquestioned rule of the common law was that every riparian owner was entitled to the continued natural flow of the stream. It is enough, without

other citations or quotations, to quote the language of Chancellor Kent (3 Kent, Comm. § 439): 'Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (currere solebat) without diminution or alteration. No proprietor has a right to use the water, to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. "Aqua currit et debet currere ut currere solebat," is the language of the law. Though he may use the water while it runs over his land as an incident to the land, he cannot unreasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate.' "

In Swain v. Pemigewasset Power Co., 76 N. H. 498, 85 A. 288, 289, the Supreme Court of New Hampshire said: "The rights of riparian owners at common law to a beneficial use of the water of the river or stream passing through or adjacent to their lands are not open to serious doubt. They are entitled to a reasonable usufruct of the water, or of the power it is capable of developing in consequence of the natural configuration of the bed of the stream opposite their respective lands."

See Kinney on Irrigation and Water Rights, vol. 1, p. 843, § 492, as follows: "The riparian owner also has the right to the use of the water of a stream flowing by his land for the development of power, either by direct power developed from the flow of the water itself, or by the generation of electric energy for the transmission of electricity to other places than at the point where the same is developed upon the stream. The use of any riparian proprietors of the water for this purpose must be reasonable as compared to the like or other uses by other riparian proprietors upon the same stream. If the water is diverted from the stream for the purpose of getting a fall and thus developing power, after its use it must be returned to the stream for the use of the other riparian proprietors below. Any other disposition of the water after use would be termed an unreasonable use of the water."

In the case at bar if one party should acquire the right of the other to the land opposite no one would doubt that the owner of the banks and stream bed would be entitled to develop and use the hydraulic power thereon, so long as the water was returned to the stream undiminished. The appellant contends that the adjoining property holders, owning the land to the thread of the stream which constitutes their boundary, are tenants in common to the stream and its bed. Appellant relies upon an early statute of the United States upon that subject, as follows:

"Sec. 2476. Navigable rivers within public lands to be public highways.

"All navigable rivers, within the territory occupied by the public lands, shall remain and be deemed public highways; and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both." Act May 18, 1796, c. 29, § 9, 1 Stat. 468; Act March 3, 1803, c. 27, § 17, 2 Stat. 235 (Rev. St. § 2476 [43 USCA § 931]).

The Supreme Court of the United States, in Scott v. Lattig, 227 U. S. 229, 33 S. Ct. 242, 243, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107 said: "Thus, Rev. Stat. § 2476, U. S. Comp. Stat. 1901, p. 1567, which is but a continuation of early statutes on the subject (Acts May 18, 1796, 1 Stat. at L. 464, c. 29, § 9, U. S. Comp. Stat. 1901, p. 1567; March 3, 1803, 2 Stat. at L. 229, c. 27, § 17), declares: 'All navigable rivers within the territory occupied by the public lands shall remain and be deemed public highways; and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both;' and of this provision it was said in St. Paul & P. R. Co. v. Schurmeir, 7 Wall. 272, 288, 19 L. Ed. 74, 78, 'the court does not hesitate to decide that Congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common-law rules of riparian ownership should apply to lands bordering on the latter, but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be and remain public highways.' "

It is not necessary to decide the exact relation of the parties in and to the power, that is, whether it has all the common law attributes of a tenancy in common or otherwise, for it is sufficient to say that each owns a part of the hydraulic power developed along their common boundary and that both together own it all. If then these two adjoining owners are entitled to the entire flow of the stream as it actually reaches their land for the purpose of generating power thereon, can

the state Legislature take the right of one owner to a part of this power and confer it upon the other in the exercise of the police power of the state? The proposition thus stated carries its own answer, for it has always been held that a state cannot in the alleged exercise of its police power take the property of one person and confer it upon another. As stated by the Supreme Court of North Carolina in Lowe v. Harris, 112 N. C. 472, 17 S. E. 539, 540, 22 L. R. A. 379: "No law which divests property out of one person and vests it in another for his own private purposes, without the consent of the owner, has ever been held a constitutional exercise of legislative power in any state of the union," citing Cooley Const. Lim. 165; Wilkinson v. Leland, 27 U. S. (2 Pet.) 658, 7 L. Ed. 553; Satterlee v. Matthewson, 27 U. S. (2 Pet.) 380, 7 L. Ed. 458; Hoke v. Henderson, 15 N. C. 4, 25 Am. Dec. 677; Wales v. Stetson, 2 Mass. 143, 3 Am. Dec. 39; Calder v. Bull, 3 U. S. (3 Dall.) 394, 1 L. Ed. 651; Dash v. Van Kleeck, 7 Johns. (N. Y.) 507, 5 Am. Dec. 291; U. S. Const. art. 1, § 10; N. C. Const. art. 1, § 17; Butler v. Pennsylvania, 51 U. S. (10 How.) 416, 13 L. Ed. 478; Fletcher v. Peck, 10 U. S. (6 Cranch) 137, 3 L. Ed. 178; Stanmire v. Taylor, 48 N. C. 207, 214; King v. Hunter, 65 N. C. 603, 6 Am. Rep. 754; Wesson v. Johnson, 66 N. C. 189; 1 Kent. Com. 455; Stanmire v. Powell, 35 N. C. 312.

In the case at bar the basic right in controversy is the right of the appellees to divert more than 220 second feet of water for power under permits issued by the state engineer. The right to 220 second feet is not disputed and the right of the appellees to a flow of 75 second feet to be taken from the stream and returned thereto above the land of the appellant is not disputed, but is not involved because it does not affect the amount of power to be developed in the stream along the boundary of the parties. To repeat, the appellees seek to divert 1,397 second feet by the canal and head works under construction. Of this, 1,102 second feet are covered by permits; 220 second feet by a conceded and adjudicated right and 75 second feet under an adjudicated right not available to the appellees at the proposed point of diversion. That is, the controverted right of the appellees is based upon its action in appropriating this 1,082 second feet of water for power purposes. The flow of the stream varies from 60,000 second feet in time of high water to about 600 second feet in time of low water. At low water the appellant would have only

about 150 second feet on its land. This amount being assured to it by the provision of the decree requiring a level of 1,070 feet at the point of diversion. The appellant's land has no value except that which arises from the riparian right for power purposes. It was purchased by appellant for that purpose. That right is worth $30,000. If the appellees can maintain their right to divert 1347 second feet at all times it will greatly diminish, if it does not absolutely destroy, the value of appellant's land. Can this taking be justified under the police power of the state?

This court has gone very far in recognizing the power of a city to destroy the value of real estate in the exercise of police power. Marblehead Land Co. v. City of Los Angeles (C. C. A.) 47 F.(2d) 528. But no court, so far as I am advised, has gone to the extent of holding that a state can grant a right to one individual which belongs to another because the first individual first applied for the right. The grant itself assumes title to be in the state and not in the individual. It is only upon this theory that a grant to the first applicant could be justified. Can it be said that a law which permits an officer of the state to grant rights in private property to the first applicant therefor is a valid exercise of police power? Certainly not, so long as the Constitution forbids the taking of private property without compensation. The Supreme Court of Oregon has not gone this far and its decisions both before and after the Water Code of 1909 recognize that under the Constitution of the United States the state could not divest the property of one person and confer it on another. That court having held in Hough v. Porter, 51 Or. 318, 95 P. 732, 98 P. 1083, 102 P. 728, that the Desert Land Act of 1877 severed from riparian land all rights to water thereon, and having recognized that right in the public it follows logically that the state could dispose of such waters on behalf of the public so far as riparian owners are concerned. On this theory the appellant, whose predecessor acquired the land by patent from the government after the Desert Land Act was passed, has no riparian right to the power and cannot complain that the owner of the adjoining riparian land has been granted rights inconsistent with its claim to power rights. But we hold that this construction of the federal statute is erroneous and that the appellant's predecessor acquired by his patent a riparian right to water and power under the laws of the United States, which at the time of the

grant recognized that the patent to riparian land conveyed such rights to the water as the state at that time recognized. In support of this well-established rule I quote from a decision of the Supreme Court in Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 43 S. Ct. 60, 64, 67 L. Ed. 140:

"It is true that where the United States has not in any way provided otherwise, the ordinary incidents attaching to a title traced to a patent of the United States under the public land laws may be determined according to local rules; but this is subject to the qualification that the local rules do not impair the efficacy of the grant or the use and enjoyment of the property by the grantee. Thus the right of the riparian owner under such grant may be limited by the law of the state either to high or low water mark or extended to the middle of the stream. Packer v. Bird, 137 U. S. 661, 669, 11 S. Ct. 210, 34 L. Ed. 819, 820.

"We said in Oklahoma v. Texas, decided May 1, 1922 [258 U. S. 574, 66 L. Ed. 771, 42 S. Ct. 406]: 'Where the United States owns the bed of a nonnavigable stream and the upland on one or both sides, it, of course, is free when disposing of the upland to retain all or any part of the river bed; and whether in any particular instance it has done so is essentially a question of what is intended. If by a treaty or statute or the terms of its patent it has shown that it intended to restrict the conveyance to the upland or to that and a part only of the river bed, that intention will be controlling; and, if its intention be not otherwise shown, it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the state in which the land lies. Where it is disposing of tribal land of the Indians under its guardianship the same rules apply.'

"In government patents containing no words showing purpose to define riparian rights, the intention to abide the state law is inferred. Mr. Justice Bradley, speaking for the court in Hardin v. Jordan, 140 U. S. 371, 384, 11 S. Ct. 808, 813, 35 L. Ed. 428, 434, said: 'In our judgment, the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the state in which the lands lie.' "

Consequently, it was held by the Supreme Court in that case that an act of the state Legislature changing the definition of a navigable stream could not retroactively affect the rights of a patentee of government land. I quote from that opinion the following which occurs immediately preceding the above quotation: "It is not for a state by courts or legislature, in dealing with the general subject of beds of streams to adopt a retroactive rule for determining navigability which would destroy a title already accrued under federal law and grant or would enlarge what actually passed to the state, at the time of her admission, under the constitutional rule of equality here invoked."

If the Legislature of a state cannot limit the rights of a riparian owner to a stream bed by a definition of navigability inconsistent with its definition at the time a patent was issued, it is equally clear that it cannot take away vested riparian rights by a new definition of such rights limiting the right to the use and appropriation then made. Clark v. Cambridge & A. Irr., etc., Co., 45 Neb. 798, 64 N. W. 239; Crawford Co. v. Hathaway, 67 Neb. 325, 93 N. W. 781, 60 L. R. A. 889, 108 Am. St. Rep. 647; 56 A. L. R. 277, note.

Assuming, however, that the state in the exercise of its police power may modify the rights of a riparian owner, how far have they been modified by the Water Code of Oregon? Ignoring for a moment the interpretation placed on this code by the Supreme Court of Oregon, it is to be observed that it expressly recognizes all vested rights in water. Section 1 provides: "Subject to existing rights, all waters within the state may be appropriated for beneficial use, as herein provided, and not otherwise; but nothing herein contained shall be so construed as to take away or impair the vested right of any person, firm, corporation or association to any water." This declaration is repeated in section 70 (Code Or. 1930, § 47-403) as follows:

"Section 70. Vested Rights Preserved.—

"1. Nothing in this act contained shall impair the vested right of any person, association or corporation. * * *

"8. * * * This act shall not be held to bestow upon any person, association or corporation any riparian rights where no such rights existed prior to the time this act takes effect."

Section 70, subd. 2, provides that: "Actual application of water to beneficial use prior to the passage of this act by or under authority of any riparian proprietor, or by or under authority of his or its predecessors in interest, shall be deemed to create in such riparian proprietor a vested right to the ex-

tent of the actual application to beneficial use; provided, such use has not been abandoned for a continuous period of two years."

Subd. 3 recognizes the right of a riparian owner to proceed with his construction of works for the application of water to beneficial use. Now the use of water by a riparian owner is the exercise of a right common to all riparian owners, and is not adverse to them. It is not measured by the needs of the riparian owner, but by the capacity of the stream to supply water to all riparian owners along its banks. Oliver v. Robnett, 190 Cal. 51, 210 P. 408. The distinction is pointed out by the Supreme Court of Oregon in a late case. In re Water Rights of the Deschutes River and Tributaries, 134 Or. 623, 704, 286 P. 563, 294 P. 1049, 1051, from which I quote as follows: "Where the old riparian right system prevails, a riparian owner using water in that capacity is, in effect, always a tenant in common with other riparian owners on the same stream, and the amount to which such riparian owner is entitled varies with the reasonable demands of the other riparian proprietors. In other words, it is not a right to a definite amount of water while an appropriator is always a tenant in severalty and a decree can be rendered under the statute recognizing the right of an appropriator for a definite amount of water." See, also, In re Water Rights of Silvies River, 115 Or. 27, 31, points 32, 33, 237 P. 322.

Hence, in so far as the Water Code recognized as a vested right, the right to water appropriated to his own use and beneficially used by a riparian owner, it did not limit (it expressly disavowed an intent to limit the right), but it extended the right of a riparian owner by recognizing his actual appropriation as creating a right in severalty which might exceed his riparian right, although it is of course true that the appropriation might be less than the riparian right. In the Hood River Case, supra, the Supreme Court of Oregon not only held that the riparian right of the Pacific Power & Light Company was subordinate to the appropriations above, but also that the Power Company was not entitled to an adjudication that it had any riparian right because it had not exercised its right prior to the enactment of the Water Code of 1909. So construed, the Water Act by its own force destroyed all riparian rights which had not been beneficially used, solely because of such nonuse, and this without giving any opportunity to exercise the right after the enactment of the law. So construed

in its application to the rights of appellant it is a clear violation of the Fourteenth Amendment to the Constitution. I hold that the Water Code did not and could not wholly destroy the power rights of the appellant. The appellees are not relying upon their riparian power rights. Their action in securing a permit from the state engineer and their development work in the stream bed is avowedly hostile to the appellant's claim. Their possession is adverse. Upon the completion of their diverting works and the installation of their power plant they will receive a certificate of ownership of the power thus developed, all in utter disregard of the appellant's rights in the stream, and this right of appellees is sustained by the decision of the court below. The decree of the court below is based upon a finding that the appellant failed to establish any water right. This finding of a lack of proof of a right is the equivalent of a finding of no water right, for appellant's case is predicated upon its riparian right which is thus put in proof. This finding and decree would be conclusive in any future litigation between the parties to establish their respective rights.

The exercise of control over water inconsistent with the rights of a riparian owner where the control thus exercised might ripen into an adverse title, has always been held to be sufficient ground for the intervention of a court of equity by way of injunctive relief. As stated by the Supreme Court of Oregon, Weiss v. Oregon Iron & Steel Co., 13 Or. 503, 11 P. 255, 258: "Nor do we think the objection to the exercise of the jurisdiction well taken. Mr. High says: 'A riparian proprietor, owning to the center of a stream, is entitled to the aid of equity to prevent a diversion of the waters from their natural channel. Nor does the neglect of complainants to use or appropriate the water-power, or the fact that they have as yet sustained but small pecuniary damage, or that defendants would be subjected to heavy expense if compelled to restore the water to its original channel, present such objections as would warrant a court of equity in refusing the relief.' High, Inj. § 795, and authorities cited."

To deny that relief without reservation would destroy appellant's right and vest a part of it in appellees. On the other hand, if each of the two riparian owners can prevent the other from developing power, neither can do so, and the right is rendered worthless to either or both. It follows that a full recognition of the common law riparian right to full and continuous flow would destroy the right.

Here is a legitimate field for the exercise of the police power of the state to give to the owner desiring to utilize his power the right to make the necessary changes on his land to do so. On the other hand, the rights of the appellant should be fully protected. This can be accomplished, I think, by granting an injunction unless the appellees shall file a disclaimer to more than one-half of the flow of the stream, after the deduction of the flow of 220 second feet to which it has an acknowledged priority, and an agreement to pay a reasonable sum for the use of all water above one-half of the remaining flow of the stream after deduction of 220 second feet, said amount to be fixed by the court, and payable monthly for such power so used for the previous month, the appellees to have the right to use the full flow of 1,347 second feet if the water level of 1,070 feet permits until such time as the appellant is ready to utilize its one-half of the flow of the stream, less 220 feet.